STATE OF MAINE
HANCOCK, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-99-30

J C H - H A - ?

Milton Staples et al.,
    Plaintiffs

    v.

Decision and Judgment

DONALD L. GARBRECHT
LAW LIBRARY

MAR 12 2003

William H. Banks, Jr.,
    Defendant

        Hearing on the complaint and counterclaim was held on August 13, 2002. Plaintiffs Gwen J. May, Lotti B. Keene and Clinton B. Staples were present. The remaining plaintiffs, Milton Staples and Melita Staples, were not present at trial; their testimony was presented in the form of a trial deposition transcript. The defendant was present at trial. Counsel for all parties also appeared. Following the presentation of evidence at trial, the parties submitted written argument that the court has considered.

        Subsequent to the trial, plaintiff's counsel filed a letter with the court advising that plaintiff Milton Staples died in September 2002. Milton Staples was one of five people who had an ownership or other property interest in the house lot (as described below), and the interest of the four survivors appear to be unaffected by the death of Milton Staples. Thus, his death has no bearing on the justiciability of the issues affecting that parcel.

        However, Milton Staples appears to have been the sole owner of the second lot at issue here, namely, the wharf lot (also as described below).[1] In January 2003, the court and counsel conferred regarding the effect of Milton Staples' death on the claims affecting the wharf lot. The court advised counsel that a decision in this case would be issued as soon as that question was resolved. As a result of that conference, plaintiffs'

---

[1] A deed dated October 12, 1998, makes reference to Milton Staples' ownership of the wharf lot but does not purport to convey it to himself and the other plaintiffs as joint tenants, in contrast to the conveyance of the house lot (identified in that deed as the "second lot"), which is conveyed to all five named plaintiffs.

1

counsel filed a motion for substitution of parties. *See* M.R.Civ.P. 25(a)(1). In that motion, Melita Staples as personal representative of Milton Staples' estate was designated as the successor party in interest. No objection has been filed to that motion, it can therefore be granted, and the realignment of parties allows the court to issue this judgment.

The plaintiffs own undivided interests in a parcel of real property located on Swan's Island, and at the time of the trial, Milton Staples (and now Melita Staples in her capacity as personal representative of Milton's estate) owns a second parcel of realty there. These non-contiguous lots are located on or near Mackerel Cove. The first of the two lots abuts a public way and is the situs of a year-round residence ("the house lot"). Title to the first lot is accompanied by "a right-of-way to the shore by the present road." The second parcel ("the wharf lot") is a small oceanfront lot that, in its inland aspects, is surrounded by the defendant's property. In 1972, the plaintiffs moved a camp onto the land that they believed constituted the wharf lot. As part of the ownership of the wharf lot, Melita Stapes (as personal representative) is also the record owner of "a right-of-way along the shore to the shore road." The deeds memorializing this right-of-way do not provide any description of its location on the face of the earth. This right-of-way is used to gain access to the wharf lot, which is otherwise accessible only from the water.

This case raises two distinct issues regarding the parties' property rights. First, the parties dispute the location of the two rights-of-way. Second, the defendant alleges that the camp associated with the wharf lot in fact encroaches onto his land. Therefore, the issues to be resolved here are the locations of the rights-of-way on the face of the earth, the location of wharf lot and the consequential claims of trespass and nuisance.

## A. Location of rights-of-way

As is noted above, the conveyances of each of the two relevant lots owned by one or more of the plaintiffs at bar also included the grant of a right-of-way. These easements have existed since at least 1946. The location of both of these rights-of-way is in issue here. The parties to not dispute the existence and the location of a portion of "the present road" noted in the right-of-way associated with the house lot. The "present road" runs off of a paved, public way (State Aid Route 1) and heads generally northwesterly toward the water, along the edge of a field where the residence of some of the plaintiffs is located

2

and, further out, where the defendant built a house. On plaintiffs' exhibit 18a (an aerial photograph), the "present road" runs from point A to somewhere beyond point B.[2] The parties dispute where "the present road," as meant and intended in the deeds, runs past point B. The plaintiffs contend that the right-of-way continues in nearly the same direction as the southern section of the road and runs from point B to approximately point C on plaintiff's exhibit 18a. If so, the course of the right-of-way would take it through or very close to the house built by the defendant several years ago. The defendant, on the other hand, argues that the northwesterly end of this right-of-way is located on an overgrown path that heads in a roughly northerly direction from the end of the "present road" (from point B toward point E on plaintiffs' exhibit 18a).[3] This would take the right-of-way away from the defendant's building.

The parties also dispute the proximity of the other right-of-way, which is associated with the wharf lot, to the water. Further, the length of this right-of-way is a function of the location of the right-of-way that connects to State Aid Route 1, because the parties dispute the point where the latter easement ends and connects to the former.

The location of the two rights-of-way cannot be established from the four corners of the deed descriptions. Indeed, the only geographical references to the right-of-way that accompanies the house lot are the present road and the shore. As to the right-of-way that allows land access to the wharf lot, the only references are the shore road and the shore itself.

The location of a boundary on the face of the earth is a question of fact. *Hennessy v. Fairley*, 2002 ME 76, ¶ 21, 796 A.2d. 41, 48. To determine that location from a deed description, the court must determine the intent of the parties to that deed. *Id.* If the facts extrinsic to the deed description are affected by a latent ambiguity, then a parcel's

---

[2] In his written summation, the defendant has appended two sketches of the ways at issue, and he has used letters to indicate certain locations on those sketches. The letters on plaintiffs' exhibit 18a differ from those on the sketches in the defendant's summation. In this order, the letters used by the court are the ones that were written on plaintiffs' exhibit 18a.

[3] On plaintiffs' exhibit 18a, there is a clearly visible way between point B and the trailer site. This road was built in approximately 1984 and is not to be confused with the location of the right-of-way advanced by the defendant, which runs through the alders between the trailer and point D and which is not visible in the photograph.

boundaries are located by reference to monuments, courses, distances and quantity, in that priority. *Id.* A "latent ambiguity" is "an uncertainty which does not appear on the face of the instrument, but which is shown to exist for the first time by matter outside the writing when an attempt is made to apply the language to the ground." *Slipp v. Stover*, 651 A.2d 824, 826 (Me. 1983) (punctuation omitted). "Monuments" are "visible marks or indications left on natural or other objects indicating the lines and boundaries of a survey. In this sense the term includes not only posts, pillars, stone markers, cairns, and the like, but also fixed natural objects, blazed trees, and even a watercourse." BLACK'S LAW DICTIONARY 1159 (rev. 4th ed. 1969. A court may also consider evidence of the historical use and location of a right-of-way, in order to establish the location of that right-of-way that is created or conveyed in a deed. *Anchors v. Manter*, 1998 ME 152, ¶¶ 14-18, 714 A.2d 134, 139-40.

The parties presented conflicting evidence respect to the historical location of both rights-of-way. To the extent that such evidence was contradictory, the court finds the plaintiffs' evidence to be more persuasive. Their accounts cover the relevant time period in a comprehensive manner, and the detail of their evidence and the nature of the activities they describe render that evidence more probative.

**(1) Location of easement "to the shore by the present road"**

For the reasons noted above, the court finds that the plaintiffs' evidence persuasively demonstrates that "the right-of-way to the shore by the present road" includes the way that is visible between points B and C on plaintiffs' exhibit 18a. The court attaches particular weight to the trial deposition testimony of Milton Staples as he addressed the locations of the rights-of-way. Those easements were created no later than 1946 (the date of the earliest admitted deeds that refer to the rights-of-way). Milton Staples was born in 1925 and was familiar with the property, its condition and its use as of 1946. The only contrary testimony was presented by the defendant himself, who would have been born in the 1950's. Thus, Milton Staples is the only witness who had personal knowledge of facts germane to the location of the rights-of-way when they became a matter of record (that is, when they came into existence).

Staples testified that the right-of-way that ran along the "present road" to the way along the shore went directly to the water. This is not consistent with the defendant's

4

contention that the way veered from the "present road" at an angle to the north or northeast. Further, the photographs used by Milton Staples during his deposition (particularly Milton Staples deposition exhibit 12) confirm that the right-of-way did not cut through the alders but rather continued along the edge of the hayfield (where the defendant built the home) until it curved toward the wharf lot.

From this evidence, the court finds from extrinsic evidence used to construe the terms of the deeds that the plaintiffs have established the location of the "a right-of-way to the shore by the present road." The location of this right-of-way is best shown in plaintiffs' exhibit 18a. In that photograph, the location of the right-of-way is indicated by the visible way between points B and C.

The court need not and therefore does not address the plaintiffs' alternative arguments that they are have an easement by prescription.

### (2) Location of easement "along the shore to the shore road"

Reflecting the evident purpose of creating land access to the landlocked wharf lot, that parcel is accompanied by a "right-of-way along the shore to the shore road." (The shore road is the way back to State Aid Route 1, consisting of the right-of-way discussed in the preceding section of this order.) For the reasons noted above, the court finds the testimonial description of the location of the wharf lot right-of-way, as provided by Milton Staples, to be persuasive.

The two termini of the wharf lot right-of-way are the wharf lot itself and the shore road (i.e., the end point of the "a right-of-way to the shore by the present road").

The remaining factual issue is where this easement is located with reference to the water. The court is persuaded that Milton Staples' description of that location makes the most sense. Because that way was used in part for vehicular traffic, it is unlikely that the way would pass over the rocks that are immediately adjacent to the water, as the defendant urges. Rather, the way traverses near the lower edge of the hayfield. Further, Staples testified that the strip of land between the northwesterly edge of the way (which is the side closest to the water) and the rocks would be used by lobstermen to store their equipment. Thus, while that storage area is not included as part of the right-of-way, it demonstrates that there is a modest physical separation between the way itself and the

5

rocks lining the shore. This is consistent with Staples' testimony that the way is located approximately 40 feet from the rocks.

The defendant argues in part that the northwesterly end of the way associated with the house lot and the location of the wharf lot right-of-way cannot be where the plaintiffs claim, because those locations would have interfered with the use and maintenance of the hayfield where the defendant built the house. However, the location of the ways as argued by the plaintiffs and found by the court accommodates the use of the field for agricultural purposes, which predated the house construction. That one or both of the rights-of-way may have crossed the lower portion of the field does not undermine the plaintiff's analysis because the intrusion is nominal.

From this, the court finds that the "right-of-way along the shore to the shore road" is best represented by the way that is visible (albeit faintly in some sections) between point C and the camp as shown on plaintiffs' exhibit 18a.

Finally, because both rights-of-way historically have been used for both vehicular and pedestrian purposes, such reasonable uses may continue today. *See Saltonstall v. Cumming*, 538 A.2d 289, 290 (Me. 1988).

## B. Boundaries of the wharf lot

The parties dispute the location of the wharf lot. The wharf lot, not surprisingly, was the site of a wharf that could be used at high tide. In 1972, one of the plaintiffs, Clint Staples (one of Milton's children), participated in moving a cabin by water to that parcel and set it on the land that the plaintiffs believe (with varying levels of confidence) that Melita Staples now owns in her capacity as personal representative. Some time after the cabin was moved to the area believed to be within the boundaries of the lot, the wharf succumbed to destructive weather conditions and is no longer there.

The record description of the wharf lot is as follows:

> Beginning at a bolt in the ledge on the shore and running in an easterly direction twenty three (23) feet to a bolt, then in an [sic] north-westerly seventy four (74) feet to a bolt on the shore, thence westerly along the shore to a bolt in the ledge, thence southerly forty nine (49) feet to a bolt in the ledge, thence southeasterly along the shore to the first mentioned bound.

Unfortunately, there are no bolts in the ledge in the area of the wharf lot. Therefore, these monuments no longer exist, and the location of this lot on the face of the

6

earth cannot be established on the basis of the deed description. This has significance here, because under the standard rules of deed construction, such monuments would have been carried predominant probative value in locating the boundaries on the face of the earth. *Hennessy*, 2002 ME 76, ¶ 21, 796 A.2d. at 48. ". . .[T]he physical disappearance of a monument terminates its status as a boundary marker unless its former location can be ascertained through extrinsic evidence." *Hennessy*, 2002 ME 76, ¶ 22, 796 A.2d at 48 (citation omitted). Because of the number of bolt holes in the ledge, the former location of the particular bolts noted in the deed description cannot be established by extrinsic evidence.

With respect to the deed itself, this leaves the court only with the monument of the shore itself, directional courses for each of the five boundaries and the distances for three of those boundaries. However, the evidence also sheds light on the historical function of wharf lots, and that background is useful here. Common in number, wharf lots were typically very small parcels of land immediately adjacent to the water and used as the land base for wharves and, presumably, any small buildings that might be appurtenant to a wharf. These circumstances are applicable here: the wharf lot is small, it is immediately adjacent to the water and it was used to service a wharf. More particularly, one of the boundaries (the last one described in the deed) runs southeast-northwest. The shape of the wharf lot flares out from that boundary to the east and north. The survey, *see* defendant's exhibit 1, reveals that prior to the time the wharf was destroyed, it extended from the lot into the water in a southwest direction. Further, the survey suggests that the width of the remains of the pier is not dissimilar from the 23 feet that is also the length of the southwest boundary of the wharf lot. Therefore, the likely configuration that results from an examination of the shape of the lot and its original use suggests that the lot's southwest line is located where a person could have gained access onto the wharf.

Two of the bolts – the ones at the southwesterly and northeasterly corners – are described as being "on the shore." The other three bolts are located simply "in the ledge." However, it appears from the survey that if the southwesterly line of the lot were aligned with the former location of the wharf, the bolt located at the southwesterly corner in fact would be on the water. From this, the court infers that at least the first bolt

mentioned in the deed description was located at the southeast end of where the pier was once located and that the corner would also be at the mean highwater mark as apparently shown in the survey, which is the limit of private land ownership that is not subject to a public easement. *See Bell v. Town of Wells*, 510 A.2d 509, 516-17(Me. 1986). Therefore, on this record, the best conclusion that can be drawn from the evidence is that the boundaries of the wharf lot have the length and compass orientation as described in the deed, and that the location of that parcel on the face of the earth is determined by placing the point noted above on the mean highwater mark and then orienting the parcel with relation to the former location of the pier.[4]

The evidence suggests that the camp that was placed on the lot in 1992 is not wholly within the boundaries of that parcel.[5] If so, then at least part of the camp is situated beyond the wharf lot boundaries and therefore on the defendant's land. The plaintiffs argue that they have acquired the land at least within the footprint of the camp by adverse possession. Although the plaintiffs and others have enjoyed the use of the wharf lot for a long time, the plaintiffs have not established that for the requisite 20 years, they have used or possessed any portion of the defendant's land where the camp sits.

---

[4] The court draws emphasis to the word "best" in the sentence associated with this footnote. As the defendant's expert surveyor noted several times during his trial testimony, it is difficult to locate the wharf lot with much confidence. The court recognizes that the wharf lot as described in the deed may not neatly fit into the area of land that actually exists there. Rather, the court must evaluate the evidence as best it can and make the best judgments that the evidence allows. Based on the limited available evidence and the fact that the wharf was used at high tide only, it makes sense to make reference to the mean highwater mark in attempting to locate the pin that marks the starting point of the deed description, which is also one of the two points defining the line where the wharf – which was the reason for the parcel in the first place – was placed.

[5] This conclusion flows from the relative configurations of the lot and the camp, irrespective of the location of the lot's boundaries on the face of the earth. The dimensions of the camp are 20 feet by 30 feet, plus the width of a deck. The camp is oriented so that its longer dimension runs in a generally southwest-northeast orientation. The deed description of the wharf lot, on the other hand, indicates that the lot's longer dimension runs in a generally northwest-southeast direction and that its width may well be less than 30 feet. The narrow dimension of the lot therefore is oriented generally southwest-northeast. The longest corner-to-corner measurements of the camp include the line between its eastern and western corners, measured kitty-corner. Thus, the camp takes up the most area near the portion of the wharf lot that is most narrow.

Further, the camp itself was on its present location for less than the 20 years when the defendant filed his counterclaim against the plaintiffs. *See* 14 M.R.S.A. § 810-A (20 year prescriptive period); *Loavenbruck v. Rohrback*, 2002 ME 73, ¶ 11, 795 A.2d 90, 93. Therefore, the adverse possession claim fails. For the same reason, the plaintiffs cannot prevail on a theory of easement by prescription. *Eaton v. Town of Wells*, 2000 ME 176, ¶ 32, 760 A.2d 232, 244 (20 year prescriptive period).

### C. Trespass and nuisance claims

The plaintiffs have asserted claims of tortious invasion of their rights in the land. They have not made a serious argument in support of their claim for money damages, and they have not proven any compensable damages. Thus, no damages for trespass and nuisance (counts 3 and 4) will be awarded.

The entry shall be:

For the foregoing reasons, declaratory judgment is entered. The court concludes that the location on the face of the earth of the "right-of-way to the shore by the present road" described in a deed recorded at book 2792 page 184 of the Hancock County Registry of Deeds, and the location on the face of the earth of "a right of way along the shore to the shore road" described in a deed recorded at book 2792 page 180 of the Hancock County Registry of Deeds are as shown in a photograph marked as plaintiffs' exhibit 18a, incorporated by reference herein, and as further described in the court's order. The defendant is permanently enjoined from obstructing or otherwise interfering with these rights-of-way.

Further, the court concludes that the location on the face of the earth of a parcel of land described in a deed recorded at book 2792 page 180 of the Hancock County Registry of Deeds is as described in the court's order. The plaintiffs are permanently enjoined from obstructing or otherwise interfering with the defendant's real property beyond their use of the rights-of-way that pass over the defendant's land.

No damages are awarded to the plaintiffs. The parties shall pay their own costs of court.

Dated: March 3, 2003

_____
Justice, Maine Superior Court

FILED &
ENTERED

MAR 0 5 2003

SUPERIOR COURT
HANCOCK COUNTY

9