2002 ME 76

**Francis HENNESSY**

v.

**William FAIRLEY**

Supreme Judicial Court of Maine.

Argued: March 5, 2002.
Decided: May 6, 2002.

Timothy J. Bryant, Roy T. Pierce, (orally), Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, for plaintiffs.

George C. Schelling, (orally), Kristin D. St. Peter, Gross, Minsky, & Mogul, P.A., Bangor, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

DANA, J.

[¶ 1] William Fairley appeals from a judgment entered in the Superior Court (Hancock County, *Marsano, J.*) rejecting a referee's report that Francis Hennessy's version of a disputed boundary line was correct. For the reasons stated in the opinion, we vacate the judgment of the Superior Court and remand to the Superior Court for a remand to the referee for a clarification.

## I. BACKGROUND

[¶ 2] This case concerns a disputed boundary line on the southwest point of Eagle Island in Penobscot Bay. The Fairley family acquired their property in 1929 [1] and their deed, identical to others back to 1884, describes the property as follows:

> Beginning at stake and stones at the shore; thence running southwesterly about sixty rods to stake and stones on the opposite shore; thence by shore and as the shore runs, to the first mentioned bound and containing two acres more or less with the buildings described there-. on. The above described land is on the southwest end of Eagle Island, being the northwest corner on the southwest end.

Hennessy acquired the abutting property in 1980 from Edith Quinn; his deed "except[s]" the Fairley property, and uses the preceding description to delineate the Fairley land.

[¶ 3] Hennessy filed a complaint in July of 1998 claiming that a fence on Fairley's lot is the true boundary between the properties. Fairley counterclaimed that the deed should control a determination of the boundary, and locates it east of the fence line running from the northern shore to the southern shore at a distance of 60 rods. Alternatively Fairley claimed that the land between the fence and his proposed line had been acquired through adverse possession.

---

1. Ada Raynes conveyed a parcel to Lincoln Fairley; Margaret Fairley conveyed the land to William Fairley as trustee of the "Fairley Point Trust" in 1975.

[¶ 4] At the parties request, the Superior Court (*Hjelm, J.*) appointed a referee pursuant to M.R. Civ. P. 53.[2] The hearing before the referee commenced in July of 2000; both counsel stipulated as to the dismissal of "adverse possession claims arising after 1980." The referee heard the following evidence.

[¶ 5] Neither of the "stake and stones" described in the Fairley deed could be located. Raymond Eaton, a surveyor familiar with Eagle Island, testified that the Fairley deed was "ambiguous." Eaton first looked for the "stake and stones monuments" but could not find them. He then examined the "distance" but concluded that he could not use the distance of 60 rods because of "erosion." He went outside the deed to assess original intent, examining historical texts and concluding that when James Quinn conveyed the future Fairley lot to his daughter Ada, he intended to convey two acres. Eaton also drew a southwesterly line of 60 rods, and used a spot close to a spring on the northern shore as an "arbitrary" starting point. This line produced a Fairley lot of approximately four acres. Eaton concluded that the 60 rod line (approximately 990 feet) did not comport with the deed because "it's excessive . . . it does not agree with what I believe the intent to be. And the intent was two acres." Eaton testified that although Fairley claimed ownership of the *high* tide path and spring, "we who know Eagle know that we all use everything anyway . . . we wander the island."

[¶ 6] During cross-examination Eaton testified that the measurement of the fence was about 611 feet, which did not fulfill the description in the deed of 60 rods, i.e., 990 feet. Eaton postulated that the fence line could have been 990 feet at one time, but that erosion could have reduced it to 611 feet: "When I considered the time period of 108 years and the fact that it involved two shores and it would have yielded a number something like 1.7 feet of erosion per year. But I've seen examples where you can lose 10 feet due to erosion in one storm. . . ." Eaton concluded that: "The fence line or what's left of the fence line delineates on the face of the earth where the property line was meant to be."

[¶ 7] Stanley Plisga examined the deeds for Fairley. As a surveyor Plisga relies on the descending order of priorities and stated that the "call for area necessarily has to come at the bottom of the list because it's a quantity that [is] derived based on the measurements associated with the property." Because the monuments were missing, Plisga expounded on the call of a "southwesterly" direction—the presumption "given the date of [the] deed," is that "southwesterly" was a "magnetic call [and] in its true sense, southwesterly would mean south 45 degrees west." Plisga testified that the distance of 60 rods had some uncertainty associated with it, yet the fence line distance of 611 feet did not satisfy the call of the deed—such a difference satisfied Plisga that "the boundary is not the fence." Plisga opined that the fence was "probably built to keep out animals" and that a determination of the acreage in 1880 would have been "a very challenging undertaking . . . [b]ecause the

---

**2.** The reference by agreement does not indicate any waiver of the parties right to object to the acceptance of the referee's report. *See* M.R. Civ. P. 53(e)(2). In pertinent part Rule 53(e) provides:

> In an action where there has been a reference by agreement, the referee's conclusions of law and findings of fact shall be subject to the right of the parties to object to acceptance of the referee's report. On waiver by all parties of the right to object to acceptance of the referee's report, the court shall forthwith enter judgment on the referee's report.

M.R. Civ. P. 53(e) (1999).

actual shoreline is very irregular [versus] if a parcel was rectangular or square in shape, it's a very easy operation to compute the area."

[¶ 8] Plisga compared an 1873 United States Geological Survey map with a map reflecting the current shoreline and concluded "that there has not been 300 feet of erosion on the southwesterly end of that point." The southwesterly end as Plisga observed it is "a fairly steep, rugged, rock coastline in that area of fairly solid granite . . . the major erosion that seems to have taken place on the island was in areas where there were dirt banks." When asked where the boundary should be located on the property, Plisga recited the deed that it should "run in a southwesterly direction, and it should be 60 rods in length," regardless of whether it encompasses two acres; thereby the fence could not be the boundary line. A boundary line drawn from the spring should be drawn "south 45 degrees west based on magnetic north in 1880," which comes "pretty darn close" to 60 rods. While the line drawn from the spring complies with the deed, "[t]he only thing we can't do is nail down exactly where it starts."

[¶ 9] James Fairley came to the island in 1930 and recalled that his father erected the fence to keep out sheep. Fairley testified that his family used the spring for drinking water and are the only persons who have maintained it. Fairley could not remember "anybody coming up [the high tide path] except in connection with our property" and that he had never observed anyone using the land on the east side of the fence on a regular basis in seventy years.

[¶ 10] William Fairley, the youngest of the three brothers, came to the island in 1939, and testified that his first memory of the fence dated to 1951, when the fence was in "disrepair." The family often used the land beyond the fence toward the Hennessy property to frequent the long spurs of rock on the southwest coast, so his mother could sit on the grassy knolls to write and to pick raspberries. He had never seen the Hennessys camping in the area and always understood that the disputed area east of the fence was Fairley land, "[a]nd to be more specific the spring [and high tide path] were unquestionably our property." Fairley acknowledged that he had received tax bills for two acres and conceded that many people on the island used the clam flat below the high tide line and picked berries in the disputed area. Also, there had been some timber cutting around 1962 in "maybe a fifth" of the area where the family picnicked and picked raspberries.

[¶ 11] Hennessy came to the island in 1967 and related that between 1967 and 1980 "we picnicked many, many, many times every year, every summer with friends, with relatives, with children," in the disputed area. Robert Quinn, a caretaker for the Fairleys since the late 1960's, testified that he had never seen any of the Fairleys camping or hiking in the disputed area, although he was not in a position to "testify in detail" about the extent to which the Fairleys used the disputed property. He observed that the owners before the Hennessys, the Quinns, used the property up to the fence line; "Jimmy started cutting wood there to build his house," and there was timber cutting in the early 1960's. Quinn acknowledged that the Fairleys had regularly maintained the spring and routinely asked Quinn to clean it; also, he was not aware of anyone other than Fairley who maintained the high tide path.

[¶ 12] The referee issued the report of findings of fact and conclusions of law in March of 2001. The referee determined that the deed contained a "latent ambigui-

ty" because the stake and stones markers had not been located, so turned to the standard rules of construction to determine the intent of parties to the deed: (1) Because the stake and stones were not located, the monument call could not be met; (2) The course call of southwesterly could mean "southwest, west-southwest or south-southwest," and because there is no starting point, "there are an infinite numbers of lines that could be drawn on a due southwest course." Moreover, Fairley's version of the boundary line would result in a parcel of "four to five acres" which more than doubles the acreage called for in the Fairley deed; (3) The distance call of 60 rods, approximately 990 feet, could not "solely" determine the boundary dispute—the fence line would have been 709 feet when "measured from its north end at present." The referee found that there "does not appear to have been much erosion ... at the northern end of the fence"; (4) The quantity call was also indeterminable because "there has clearly been erosion in the area of the parcel in front of the Fairley house[,] thus the quantity of land within the fence area at this time is clearly somewhat less than what it would have been in 1884."

[¶ 13] Because the referee concluded that the descending priority rule would produce an "absurd result" he examined the adverse possession claims. The referee stated, "[d]uring the course of the hearing, counsel for the parties stipulated to the dismissal of any claims of adverse possession during the period from 1980 to the date of the hearing"; the pre–1980 evidence illustrated that the Fairley use of the spring and high tide path met all the elements of adverse possession, while the use of the land south and east of the fence

line did not. The referee concluded that the boundary line began

> at the northwesterly side of a tiled spring located on the easterly end of the Cove at the southern end of Eagle Island, thence bearing southwesterly to a point on the opposite shore at the southern end on an existing fence line and then returning to the point of origin along the southerly end of said Eagle Island.

[¶ 14] Shortly thereafter Fairley moved to reject the report of the referee. A hearing on the motion was held in June of 2001 and the Superior Court issued an order on the motion to reject the report two months later.

[¶ 15] First, the court decided *not* to adopt the referee's factual findings because "the Referee acceded to the stipulation of the parties respecting adverse possession after 1980, [thus] this Court finds the report is clearly erroneous." The court declared pursuant to Rule 53(e) it would "modify" the report and then found that Fairley had not established a claim of right to the land east of the fence or the spring and high tide path area.[3] The court concluded that judgment must be for Hennessy and that the boundary followed the fence line. Fairley appealed the decision to this Court.

## II. DISCUSSION

### A. The Rejection of the Report

[¶ 16] Fairley contends that the Superior Court should have accepted the stipulation (that the parties would *not* present evidence to support a claim of adverse possession from 1980 to the present) so that it was clear error for the court to reject the report based on its finding that Fairley

---

**3.** The court acknowledged that the scope of use of the spring and high tide path could mean Fairley has a right to walk to and from his property on the high tide path and use the water from the spring; however, Fairley needed to request a hearing on the matter.

presented "no evidence of activity within the last 20 years on the disputed parcel."

[¶ 17] The use of referees is provided for because "reference relieves justices of the Superior Court from the necessity of conducting the trial and requires only that they consider the acceptance or rejection of the referee's report and the entry of judgment." *Bruk v. Town of Georgetown,*[4] 436 A.2d 894, 896 (Me.1981). A referee's report that finds facts and makes legal conclusions without error has a consummating effect once it is accepted and a judgment is entered by the court: "Rule 53 has not changed the well-established principle that the referee's finding is final if supported by credible evidence and not otherwise erroneous as a matter of law." *Wendward Corp. v. Group Design, Inc.,* 428 A.2d 57, 61 (Me.1981). The scope of review of a report is "limited," *see* Field, McKusick & Wroth, *Maine Civil Practice* § 53.4 at 701 (2d ed.1970), that is, "[t]he Superior Court is *required* to accept the referee's factual findings on these issues unless they are clearly erroneous." *Walker v. Provost,* 566 A.2d 749, 750 (Me.1989) (emphasis added).

[¶ 18] If the Superior Court "modifies" the referee's report, we review the evidence to see whether it supports the referee's finding, or the court's modification. *See, e.g., Wendward Corp.,* 428 A.2d at 61 (because the evidence supported the referee's finding that the "disputed expenses were caused by defendants' negligence," rather than the court's modification that the costs would have occurred irrespective of defendants' negligence, the Superior Court's modification was "in error"). When the Superior Court accepts the findings of fact of the referee but modifies the report by ordering a different remedy, we have stated, "[b]ecause the court's judgment is based on the referee's report, we review directly the decisions of the referee." *Phillips v. Gregg,* 628 A.2d 151, 152 (Me.1993). In the present case, the court rejected the report and decided the case *de novo* by making factual findings and reaching legal conclusions. The Superior Court "rejected" the referee's report as "clearly erroneous" because the referee accepted the stipulation about adverse possession past 1980. However, the court may find the report, or parts thereof, "clearly erroneous" only when the *factual findings* are unsupported by the record; accepting a stipulation is not an erroneous factual finding.

[¶ 19] Clearly, "a stipulation should be adhered to unless it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties," or the agreement was made by apparent mistake. *MP Associates v. Liberty,* 2001 ME 22, ¶ 29, 771 A.2d 1040, 1049. Neither party argues that the stipulation should be examined for injustice or mistake. We have recognized the legality and binding effect of an agreement to foreclose adjudication of an issue before a referee. *See Thornton*

---

4. Fairley, in his brief, relies on *Bruk,* 436 A.2d at 894, to contend that the Superior Court should have conducted an "identical review" of the same materials as the referee, arguing, "[when] called upon to accept, reject, or rule upon objections to the referee's report, the presiding Justice must conduct an identical review." However, Fairley takes the foregoing quote out of context and misunderstands its meaning. In *Bruk,* we did not endorse an "identical review" but rather pointed out that the use of a referee in an appeal from a zoning board decision was inappropriate. *Id.* at 896. We stated:

> The use of a referee in such cases contributes neither to the efficiency nor expedition, and the Superior Court justice is not relieved of any function. The referee conducts a record review. When called upon to accept, reject, or rule upon objections to the referees report, the presiding justice must conduct an identical review.

*Id.*

*v. Estate of Cressey*, 413 A.2d 540, 543 (Me.1980).[5]

[¶ 20] In the present case, because the court rejected the entire report as "clearly erroneous" at the outset, it did not explicitly assess the referee's interpretation of the law. Although the Superior Court initially had the option of rejecting or accepting the report, the court's rejection was improper because it was based on an erroneous reason—the court did not point to any clearly erroneous factual findings. Nor do the parties argue on appeal that the referee found facts in clear error.

B. The Referee's Assessment of the Deed

[¶ 21] We next examine the referee's report for errors of law. A determination of a boundary between properties "as ascertained from a deed is a question of law[;][w]here [a boundary] is on the face of the earth is a question of fact," which will not be disturbed unless clearly erroneous. *Wallingford v. Kennedy*, 2000 ME 112, ¶ 15, 753 A.2d 493, 497 (quoting *Lawton v. Richmond*, 1997 ME 34, ¶ 9, 690 A.2d 953, 955). Typically the face of the deed is examined to reveal the intent of parties, unless facts outside the deed reveal a latent ambiguity—then the "standard rules of construction and circumstances surrounding the drafting of the deed" are used to resolve the issue of intent. *Wallingford*, 2000 ME 112, ¶ 15, 753 A.2d at 497. "Unless application of the standard rules of construction would yield absurd results or results manifestly inconsistent with the intention of the parties to the deed, the rules require that boundaries be controlled in descending order or priority by monuments, courses, distances and quantity." *Id.* ¶ 18.

[¶ 22] We have recognized that "the physical disappearance of a monument terminates its status as a boundary marker unless its former location can be ascertained through extrinsic evidence." *Milligan v. Milligan*, 624 A.2d 474, 478 (Me.1993). In the case before us, it is undisputed the stakes and stones identified in the Fairley deed are missing, and that no extrinsic evidence was presented to establish their location. Although it is possible to locate "an ambiguous or unknown starting monument by measuring a known course backward from the terminus of the first call," *Taylor v. Hanson*, 541 A.2d 155, 158 (Me.1988), the missing "stake and stones" described in the Fairley deed were both the beginning and the terminus of the first call, so there is nothing to measure back from to locate the starting point.

[¶ 23] The referee correctly found that the course and distance could not define the boundary line. While the course and distance are specific on the face of the Fairley deed, the *only* thing that can give these calls any context or application are the missing monuments. Fairley's proposed boundary line from the spring, which happens to be about 60 rods and runs in a southwesterly direction, would be legitimate only if the spring were identified as a monument. Because the spring is not so identified, it cannot be used as a starting point. The quantity measurement of two acres also cannot be controlling because of erosion over the last hundred years. Thus, the referee's report did not err in its understanding of the legal principles guiding deed interpretation. Because a boundary line could not be located from the deed, the referee

---

**5.** In *Thornton*, the pretrial order deferred the issue of adverse possession and we recognized that the agreement removed the issue from the referee's cognizance. Thus, in *Thornton*, the Superior Court should have rejected the part of the referee's decision that decided, in error, the issue of adverse possession (the mistake, though, was harmless). *Thornton*, 413 A.2d at 543, 546.

turned to the adverse possession claims to assess whether a boundary could be established by assessing what land the parties used. In doing so, the referee did not err as a matter of law.

## C. The Referee's Assessment of Adverse Possession

[¶ 24] Fairley contends that he adversely possessed the land east of the fence, as well as the spring and high tide path, while Hennessy argues the Fairleys were on the island only a couple of weeks of the summer so did not establish the kind of use necessary to establish adverse possession.

[¶ 25] We will uphold a determination of adverse possession if "supported by credible evidence in the record." *Striefel v. Charles–Keyt–Leaman Partnership*, 1999 ME 111, ¶ 7, 733 A.2d 984, 989. A party claiming title by common law adverse possession[6] must "prove by a preponderance of the evidence that [his] possession and use of the property [was]: (1) actual; (2) open; (3) visible; (4) notorious; (5) hostile; (6) under a claim of right; (7) continuous; (8) exclusive; and (9) of a duration exceeding the twenty-year limitations period." *Id.* ¶ 6 (internal quotation marks omitted).

[¶ 26] Upon giving due regard to the referee's ability to assess the credibility of witnesses and weigh the evidence, we conclude that the referee's finding that Fairley owns the spring and high tide path is supported by the evidence. The systematic maintenance of the spring and use of the high tide path, in addition to the other evidence, fulfills the criteria for adverse possession for that land. For the rest of the land east of the fence, the referee did not err in concluding the elements of adverse possession were not met.

[¶ 27] Although the referee determined that Fairley owns the spring, the spring cannot then be substituted for a "stake and stones" as a monument. Once it is determined that the deed cannot locate the boundary line according to requisite legal standards, the deed loses its efficacy in the determination of the boundary dispute. While the words of the Fairley deed are comprehensible, it's instructions cannot be manifested in the world without the monuments. The referee thereby determined the boundary line by figuring out what Fairley owns—instead of using the deed to define the line, the only option was to use Fairley's ownership by adverse possession to locate the boundary. Although the referee did so in broad terms, those terms are insufficient to establish the line on the face of the earth.

[¶ 28] Therefore, we remand for the referee to clarify the boundary line. The line should be drawn according to what the referee determined Fairley owns, i.e., the spring and high tide path area, as well as the land up to the fence. As currently written, the line starts at the *"northwesterly* side of tiled spring ...." However, this excludes the spring from Fairley's possession and is inconsistent with the referee's finding that Fairley owns the spring by adverse possession. Further, the boundary line drawn by the referee does not extend to the shore.

The entry is:

Judgment vacated and remanded to the Superior Court to remand to the referee for clarification.

---

6. If the parties do not claim adverse possession pursuant to statute, the common law applies. *Striefel,* 1999 ME 111, ¶ 5, 733 A.2d

at 989. Here, neither party claimed adverse possession pursuant to statute.