STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-02-2

Angela M. Farrell,
    Plaintiff

FILED & ENTERED
SUPERIOR COURT

DEC 0 5 2003

PENOBSCOT COUNTY

v.

Decision and Judgment

Thomas W. Gardner et al.,
    Defendants

DONALD L.     
LAW     

and

Machias Savings Bank,
    Party in Interest

JAN    2004

A jury-waived hearing on the complaint and counterclaim was held on June 3-5, 2003. On each hearing date, the plaintiff and the defendant Thomas W. Gardner were present with counsel. Defendant Michelle D. Gardner appeared through counsel. Party in interest Machias Savings Bank, the mortgagee of the defendants' parcel, did not wish to participate in the trial proceedings because it concluded that its interest would not be impaired by the outcome of this case and, with the agreement of the parties, was excused.

Through the claims that remain pending, the parties seek a determination of the location of a common boundary to their parcels of real estate located on Cold Stream Pond in Enfield.[1] At issue is the ownership of a narrow triangular shaped area of land, two sides of which are roughly 160 or more feet in length, and the third side, which borders on the pond, being less than 20 feet wide. A predecessor in title to the defendants had cleared and graded that 20 foot stretch of shoreline so that it can be used as a boat

---

[1] In her complaint, the plaintiff also included claims for money damages based on allegations of trespass and illegal removal of a monument. Additionally, the defendants had brought a counterclaim for trespass. The parties withdrew these claims, leaving only their respective claims for declaratory judgment.

1

launch and otherwise provide access to the water. The parties each contend that they hold record title to this disputed area,. Additionally and alternatively, the defendants argue that they have a superior claim to that area by acquiescence.

The parties' abutting parcels of real estate both front on Cold Stream Pond. The plaintiff's land has waterfront on its easterly and southerly sides, and it abuts the defendants' property to the west. Correspondingly, the defendants' property abuts the plaintiff's on its easterly side, and the southerly boundary is waterfront. In the deed, the westerly line of the plaintiff's property is described as starting "at an iron pin set in the ground on Gilman Point, so-called [the name of the area where the plaintiff's parcel is located], about one-hundred feet northwesterly of that portion of Gilman Point which projects the farthest into the Lake. . . ." *See* plaintiff's exhibit 4. The deed description therefore identifies this pin as the southern terminus of the plaintiff's westerly boundary. From that point, the plaintiff's westerly boundary runs in a northerly direction "one hundred eighty-eight (188) feet, more or less, to an iron pipe set in the ground near a silver birch tree. . . ." *Id.* This is the same description that has been used since at least 1912. *See* plaintiff's exhibits 11, 12. The iron pin nearest the water has not been located, and there is insufficient evidence to identify the projection of land into the water that, according to the deed, is roughly 100 feet from the former location of the pin. Therefore, the resulting question is where, on the face of the earth, that boundary line is located.

The description of the defendant's property, as set out in their deed, *see* plaintiff's exhibit 15, begins "at a found pipe on the westerly line of the land of Gregg Farrell," which is at the northwest corner of the plaintiff's property.[2] From that starting point, the easterly boundary of the defendants' property runs "along the line of Farrell one hundred sixty-two and eight tenths (162.8') feet to a 5/8" rebar set by Richard Perry, Jr. . . . ." *Id.* The line then continues an additional three feet "along the land of Farrell," where it then intersects the shoreline. According to the deed description, the southerly boundary of the defendants' parcel then runs westerly along the water for a distance of 132 feet. The property now owned by the defendants constituted an outconveyance of a larger parcel

---

[2] Gregg Farrell is the plaintiff's husband. Initially, the Farrells owned the property jointly. *See* plaintiff's exhibits 5 and 6. Subsequently, Gregg Farrell conveyed his interest to the plaintiff. *See* plaintiff's exhibit 4.

that included the plaintiff's land. *See* plaintiff's exhibit 19 (1923 deed). Because of this and because of the terms of the deeds, an identification of the defendants' easterly line is a function of the identification of the plaintiff's westerly line.[3]

The location of a boundary on the face of the earth is a question of fact. *Hennessy v. Fairley*, 2002 ME 76, ¶ 21, 796 A.2d. 41, 48. To determine that location from a deed description, the court must determine the intent of the parties to that deed. *Id.* If the facts extrinsic to the deed description are affected by a latent ambiguity, then a parcel's boundaries are located by reference to monuments, courses, distances and quantity, in that priority. *Id.* "Monuments" are "visible marks or indications left on natural or other objects indicating the lines and boundaries of a survey. In this sense the term includes not only posts, pillars, stone markers, cairns, and the like, but also fixed natural objects, blazed trees, and even a watercourse." BLACK'S LAW DICTIONARY 1159 (rev. 4th ed. 1969. ". . .[T]he physical disappearance of a monument terminates its status as a boundary marker unless its former location can be ascertained through extrinsic evidence." *Hennessy*, 2002 ME 76, ¶ 22, 796 A.2d at 48 (citation omitted).

The court ultimately concludes that the terminus of the boundary at issue here is located easterly of the boat launch and that the boundary line itself is as shown in the survey prepared by William Webber, the defendants' surveyor expert. The central

---

[3] The deed description of the defendants' easterly boundary identifies two monuments: the westerly boundary of the plaintiff's property, and the pin set by Richard Perry, Jr. (An adjoining tract is a monument if it is identified as a boundary in the deed. *Snyder v. Haagen*, 679 A.2d 510, 514 (Me. 1996).) The essence of the defendants' position at bar is that the Perry pin is *not* located on the Farrell line. In fact, Perry is the plaintiff's surveyor expert who set that pin as part of his work for the plaintiff in this case. In the deeds used to transfer interests to the defendants' property prior to the time Perry set that pin, the southerly terminus of the easterly boundary to that parcel was described as "an iron stake driven in the ground at the southwest corner of land" now owned by the plaintiff. *See* plaintiff's exhibits 16-19. From the evidence, it is clear that the defendants' grantor intended to convey to the defendants all of the relevant property up to the plaintiff's line. (The grantor retained a parcel of land on the westerly side of the land that he conveyed to the defendants, which is on the other side of the defendants' land from the plaintiff's.) Thus, to the extent that there is an inconsistency between the references to two monuments in the defendants' deed description, the reference to the Perry pin must yield to the reference to the Farrell line. Thus, notwithstanding the reference to the pin, the ultimate question presented here is the location of the plaintiff's westerly boundary on the face of the earth.

3

specific factual question is whether the relevant pin described in the plaintiff's deed had been located on the west side or the east side of the boat launching area. The unassailable evidence demonstrates that there had been a pin to the east of the disputed area and relatively close to the site of the boat launch. Unbiased witnesses who spent considerable amounts of time on the shorefront property in that area testified that a pin used to be there. The presence of the pin is established most clearly by testimony from Robert Johnson, whose family owned the land that is now the defendants'. Johnson recalls that when he was young, he cut his leg on the metal stake, and the son of the plaintiff's grantor remembers the same incident. Even if there may be variations regarding the descriptions of the pin or of its specific location, the fact remains that there was a pin easterly of the boat launch location near the water. On the other hand, there is no competent evidence that there had been a pin on the westerly side of the disputed area.[4]

The location of the line as envisioned by Webber is corroborated by extrinsic evidence regarding the way that the previous owners and occupants of the parties' parcels historically had treated their property interests. The plaintiff acquired her parcel from Bruce McGhee. The property had been in McGhee's family for nearly forty years, until the 1988 conveyance to the plaintiff. McGhee himself owned it since the mid-1970's. Before then, he spent summers there. McGhee did not believe that he owned the land at issue here, and he did not use the disputed area. To the contrary, the best evidence is that the disputed section was used almost exclusively by the defendants' predecessors in interest. The Johnson family built a large fireplace on a cement slab that they constructed squarely within the disputed area. The fireplace was oriented so that it faced away from the plaintiff's property. Members of the Johnson family also created the boat launch itself. McGhee and others associated with him did not use that facility. Although the parties contest the degree, the evidence demonstrates that the disputed area historically has been more open to the defendant's parcel and that there was considerable undergrowth between that area and the camp on the plaintiff's land. The boat launch also is accessible by vehicle from the defendants' property due to the configuration of vehicular parking. In light of evidence that that portion of the defendants' property has

---

[4] The court gives no weight to Perry's speculation to the contrary.

4

been relatively open, this is additional evidence regarding the nature of the use of the disputed area and the identity of those using (and not using) it.

A cesspool, since filled in by the plaintiff, is also within the disputed section of land. Because a plastic pipe runs between the cesspool and the camp on the plaintiff's property, the plaintiff argues that the use and occupancy of the disputed area is not exclusive. However, two factors weaken this argument. First, the pipe runs under the plaintiff's camp, but it is not connected to anything. Second and more importantly, McGhee did not use that cesspool. The court finds it unlikely that a plastic pipe has been there for more than fifty years (in other words, predating the McGhees' ownership of the land). The plaintiff did not install it, and so its origin is unclear. Nonetheless, there is another cesspool on the plaintiff's land, close to the camp building itself. It is this cesspool that McGhee used. Thus, the court has considered the evidence of the pipe but, under these circumstances, does not place significant weight on it.

As is noted above, those witnesses who testified about the location of the pin did not describe its location with the specificity that one would expect from a surveyor. This, of course, is not unexpected. However, the previous owner, William Drake, had showed the defendants' grantor, Robert DeGrasse, where the pin had been situated. Drake told DeGrasse that he (Drake) previously had removed the pin, so DeGrasse himself never saw it. However, DeGrasse testified that Drake had pointed to a spot three or four feet on the easterly side of the boat launch. This is the confined area that Webber used to locate that end of the parties' boundary line. If anything, it could be argued that because this spot is so close to the boat launch, Webber's line is conservative because it is placed on the side of the boat launch, where the evidence demonstrates it should be, but it does not extend closer to the plaintiff's camp than necessary or appropriate.

The conclusion embodied in Webber's survey is contrary to that reached by the plaintiff's expert, Richard Perry. For a number of reasons, however, the court declines to give Perry's opinion the weight that would be necessary to carry the day for the plaintiff. First, the court concludes that his methodological approach was not as sound as Webber's. Perry set a pin at the southerly end of the parties' common boundary by measuring 8 rods (132 feet) from the southwesterly corner of the defendant's parcel. He confirmed the location of that latter point by reference to a number of other lots that are

5

situated sequentially along the waterfront to the west of the defendant's lot. This creates at least two problems. First, the lots were created in an east-to-west order.[5] Therefore, Perry has relied heavily on the apparent locations of the more recently created lots in order to determine the location of the senior lot. This approach is flawed because the location of the junior lots is dependent on the location of the senior lot – the deeds to the junior lots can only convey what is left over from prior conveyances -- , and not the converse. That James Harris, another surveyor who had some involvement in this case, used the same approach does not solve this problem.

Perry's approach is also problematic because after finding the point that he believed to be the defendant's southwest corner, he simply measured 8 rods back toward the plaintiff's lot to find the common southerly corner of the parties' parcels. Two issues affect this method. It places too much emphasis on the accuracy of the distance call associated with the southern boundary of the defendant's land. Under the analytical priority used to construe deeds when the location of a boundary is in dispute, distances rank third. Monuments are to be assigned the greatest amount of probative weight, and here, for the reasons noted above, there is good evidence of the former location of the pin marking the southern terminus of the boundary at issue here. Additionally, aside from the abstract principle of construction set out in *Hennessey* and many other Maine cases, distance calls for Cold Stream Pond properties are rather notoriously inaccurate. As Harris testified, many of the lots in that area were laid out with a rope that, on other days, was used to tie up cows, and uncertainty is both prevalent and justified. *See* plaintiff's exhibit 29 at pp. 29, 40. This is further shown by Webber's findings that there were discrepancies between the distance calls for the northern boundaries of those westerly lots and the apparent actual locations of those lines. Thus, Perry's dispositive reliance on a distance call in the defendant's deed weakens his resulting opinion.

The flaw in Perry's methodology is the strength of Webber's. When Perry's opinion rests primarily (if not exclusively) on information derived from the deeds, Webber's analytical base is more thorough. He considered the record descriptions, as did

---

[5] This sequence is established not only by Webber's testimony but also in part by the dates of the deeds admitted into evidence and by the book and page references in several of Perry's surveys. *See* plaintiff's exhibit 1; defendants' exhibits 2 and 4.

Webber. However, Webber also took into account historical information of the type set out above and properly used it as extrinsic evidence to generate other important information, such as the location of a pin that, because it is a monument, is entitled to great weight.

The court is also troubled by the evolution of Perry's opinion. In 1998, Perry concluded that a pin at the end of a fence on the McGillvray property (to the north of the parties' parcels) was on the parties' common boundary line. From there, the line ran southward to the point which Perry set on the western side of the boat launch, 8 rods to the east of the defendant's other southern corner. On a subsequent visit to the site, Perry found what he believed to be the pin that, according to the plaintiff's deed, is located "near a silver birch tree. . . ." Perry was sufficiently confident that this newly found pin was the monument noted in the deed that he abandoned the use of a monument that previously was central to his opinion and, as a result, changed his opinion regarding the location of the boundary line. *See* plaintiff's exhibit 1. The shift in location was not great, but the court is willing to conclude that, particularly for a surveyor, *any* change of opinion regarding the location of a boundary line is significant, particularly when the earlier opinion was intended to be the final word (as it was here for Perry). However, there is considerable doubt whether the birch tree near the location of the pin was the same tree described in the deed, which dated back to the early 1900's. Also, when Webber saw the pin, the nature of the surrounding soil raises real questions about how long the pin had been there. Perry's reliance on those factors affects the weight to be given to the more central aspects of his opinion here.

Finally, a series of other factors[6], when viewed in combination with the ones noted above, ultimately persuades the court that Perry's opinion suffers from flaws that

---

[6] For example, Perry failed to include express and important limitations on the nature and prospective use of the survey documents he created; his survey of the plaintiff's property was not comprehensive and thus omitted an opportunity, for example, to verify aspects of the northerly end of the parties' common boundary, including the location of the pin near the silver birch tree, because he did not full examine its relative location to features of the adjacent McGillvray line; although he relied on the location of the lots located to the west of the defendant's parcel, he did not include them in at least one survey (defendant's exhibit 3) that he intended to serve as a final product; and Perry's final product was

render it less probative than the conclusions reached by Webber. For these reasons, the court accepts Webber's opinion regarding the location of the disputed property line.

The court recognizes that Webber's opinion is based on some matters that are not free from debate. For example, under Webber's analysis, the southern boundary of the defendants' property is 20 feet longer than the distance call in their deed. (This 20 foot section is the same 20 feet as the width of the boat landing, which Perry excludes from the defendants' property.) However, as is noted above, the more important evidence of the location of the parties' common boundary is the evidence establishing the approximate area where the pin near the water had been located. Additionally, despite the defendants' argument to the contrary, Webber can be seen to hold that the parties' common boundary line is an extension of a north-south oriented fence that McGillvray had erected at the upper end of the plaintiff's western boundary line. However, McGillvray testified that he believed that his fence was not located directly on the property line but rather that it was a small distance (perhaps a foot) inside his line to avoid any encroachment on the property that the plaintiff now owns and that this particular section of fence was moved even further off of the line to avoid the tree, near which Perry found the pin. Any weakness in Webber's opinion arising from McGillvray's testimony is mitigated in two ways. First, the testimony of McGillvray cannot be seen as determinative evidence about the location of his boundary line relative to the location of the fence. His testimony was based on his impression of the former, and in light of the boundary issues affecting many of the lots in the area (including, of course, those of the parties), McGillvray's testimony cannot be used as the standard against which to evaluate the validity of Webber's opinion. And second, the location of the southern end of the parties' common boundary is more important in this case than the northern end. Although there obviously is some interrelationship between the two, the fact remains that the best evidence of the southerly terminus of the line is integrated into Webber's opinion.

Because the court finds that the defendant owns the disputed area based on the construction of the relevant deeds and application of the deed descriptions to the face of

_____

described as a "retracement survey," which does not rise to the level of a standard boundary survey, such as the one Webber generated in this case.

8

the earth, the court need not and does not reach the defendants' alternative contention that they have acquired title to that area by acquiescence.

The entry shall be:

For the foregoing reasons, on the plaintiff's action for declaratory judgment, judgment is entered for the defendants.

On the defendants' counterclaim for declaratory judgment, judgment is entered for the defendants (the counterclaim plaintiffs). The court finds and concludes that the common boundary of the real property owned by counterclaim plaintiff Thomas W. Gardner and Michelle D. Gardner as described in the deed recorded at book 6828 page 303 of the Penobscot County Registry of Deeds, and of the real property owned by counterclaim defendant Angela M. Farrell, as described in the deed recorded at book 6136 page 313 of the Penobscot County Registry of Deeds is located on the face of the earth as shown in defendants' exhibit 1, which is a standard boundary survey prepared by William E. Webber, Sr. of Webber Surveying dated November 20, 2000, revised April 27, 2001, and which is incorporated by reference herein.

The counterclaim plaintiffs (the defendants) are awarded their costs of court.

Dated: December 3, 2003

Justice, Maine Superior Court
Jeffrey L. Hjelm

9

ANGELA M FARRELL   - PLAINTIFF
239 CEDAR STREET
BANGOR ME 04401
Attorney for: ANGELA M FARRELL
JON HADDOW
FARRELL ROSENBLATT & RUSSELL
PO BOX 738
BANGOR ME 04401-0738


Attorney for: ANGELA M FARRELL
ANGELA FARRELL
FARRELL ROSENBLATT & RUSSELL
PO BOX 738
BANGOR ME 04401-0738



vs
THOMAS W GARDNER   - DEFENDANT
RR 2 BOX 2540 CLAY ROAD
LINCOLN ME 04457
Attorney for: THOMAS W GARDNER
PHILLIP BUCKLEY
RUDMAN & WINCHELL
84 HARLOW ST
PO BOX 1401
BANGOR ME 04402-1401


MICHELLE D GARDNER   - DEFENDANT
239 CEDAR STREET
BANGOR ME 04401
Attorney for: MICHELLE D GARDNER
PHILLIP BUCKLEY
RUDMAN & WINCHELL
84 HARLOW ST
PO BOX 1401
BANGOR ME 04402-1401


MACHIAS SAVINGS BANK - PARTIES IN INTEREST
C/O E HENNESSEY P O BOX 313
MACHIAS ME 04654


Attorney for: MACHIAS SAVINGS BANK
THAD ZMISTOWSKI
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210

SUPERIOR COURT
PENOBSCOT, ss.
Docket No   BANSC-RE-2002-00002


DOCKET RECORD

Filing Document: NOTICE OF REMOVAL          Minor Case Type: BOUNDARIES
Filing Date: 01/04/2002

## Docket Events:
02/14/2002 FILING DOCUMENT - NOTICE OF REMOVAL FILED ON 01/04/2002

02/14/2002 ATTORNEY - RETAINED ENTERED ON 01/04/2002