STATE OF MAINE  
PENOBSCOT, SS.

DISTRICT COURT  
NEWPORT  
CIVIL ACTION  
Docket No. RE-03-68

Charles T. Merrill et al.,  
    Plaintiffs/Counterclaim  
    Defendants

DONALD L. GARBRECHT  
LAW LIBRARY

DEC 0 8 2006

v.

Decision and Judgment

FILED / ENTERED  
SUPERIOR COURT  
NOV 1 6 2006  
PENOBSCOT COUNTY

Joseph C. Foster et al.,  
    Defendants/Counterclaim  
    Plaintiffs

Hearing on the complaint and counterclaim was held on June 15 and July 14, 2006. The parties appeared with or through counsel. In this action, the parties contest the location of a common boundary line, and the defendants have pursued a claim for money damages and other relief based on their allegations that plaintiff Charles T. Merrill trespassed on the land they claim as theirs.[1] Both sets of parties claim that they own record title to a disputed section of land, and the Merrills also contend alternatively that they acquired title by acquiescence.[2] The court addresses the question of record title first.

The Merrills' parcel was created through an outconveyance of a larger parcel that the Fosters now own. Both parcels are located on the easterly side of route 7 in Corinna, and the Merrills' property is northerly of the Fosters' abutting parcel. The parties dispute ownership of a triangular section of land that is approximately 1.6 acres in size. This area is either the southerly section of the Merrills' property or the northerly section of the

---

[1] During the trial, the court granted judgment as a matter of law in favor of plaintiff Diane R. Merrill on the defendant's trespass claims, leaving those claims pending only against co-plaintiff Charles T. Merrill.

[2] In their complaint, the Merrills further alleged that they acquired title to the disputed section of land by adverse possession, and they argue that point in their written summation. However, at the outset of the trial, the Merrills waived any claim based on adverse possession. The court therefore does not address any such theory here.

1

developed subsequent to the trial in the case has made clear that the Fosters are not entitled to both common law and statutory damages for losses that fall within the scope of the statutory cause of action; rather, the damages available for a violation of statute are those prescribed by that statute. *See Fuschetti v. Murray*, 2006 ME 100, ¶ 12, 903 A.2d 848, 852. Nonetheless, the Fosters have failed to prove that Merrill cut trees from the disputed land (found herein to belong now to the Fosters) after the Fosters acquired their land. As is noted above, the Fosters did not pay close attention to the land that is now in dispute, and the evidence that Merrill cut trees off of it subsequent to the Fosters' acquisition of their parcel is insufficient. The more likely circumstance is that Merrill engaged in that cutting, which was relatively modest, in 1999, a year or so prior to the time the Fosters acquired the land they now own.

The Fosters also claim that Merrill damaged the disputed land because he used it to store vehicles. Merrill committed the common law tort of trespass onto the land. *See* RESTATEMENT (SECOND) OF TORTS § 158 (1965). However, there is no evidence of actual damages. The evidence does not substantiate the Fosters' allegations that oil leaked from the vehicles onto the land. Indeed, the best evidence suggests that after the Fosters made a complaint to state officials, environmental agents inspected the scene but found no damage. The Fosters also seek damages amounting to as much as $30 per day for "storage" of Merrill's vehicles on that property. Such as claim is baseless and cannot form the basis for damages. The Fosters have not demonstrated that they are entitled to anything other than nominal damages and an order requiring Merrill to remove the vehicles from the Fosters' property.

The entry shall be:

For the foregoing reasons, on the complaint and on counts 1 and 2 of the counterclaim, judgment is entered for the defendants (counterclaim plaintiffs). The southerly boundary of real property now owned by the plaintiffs and described in a deed recorded at book 9026 page 172 in the Penobscot County Registry of Deeds, and the common northern boundary of real property now owned by the defendants and described in a deed recorded at book 7289 page 258 of the Penobscot County Registry of Deeds is located as depicted in a survey plan dated November 11, 2003, prepared by CES and admitted into evidence as defendant's trial exhibit 1.

8

Fosters' property. One of the points of that triangle is located on route 7, and so the disputed section fans out toward the east. The deed of conveyance to the Merrills, *see* plaintiffs' exhibit 2e, contains the only substantive record description of the boundary line in dispute. (The description in the Fosters' deed, *see* plaintiffs' exhibit 4c, merely excepts the prior outconveyance now owned by the Merrills.) The parties agree on the location of the westerly end of the disputed boundary line. The record description of the line recites that it runs from that undisputed point ". . .in an easterly direction [from route 7] parallel with the southerly line of. . .[the parcel abutting the Merrill's land to the north], fifty-nine (59) rods, more or less, to an iron pipe in the westerly line of land owned or occupied by Jacob Bemis;. . . ." From that point, the Merrills' boundary runs northerly for 300 feet, more or less, along the westerly lines of the Bemis property and the former Goulette property, ending at an iron pipe. This intersects with the northerly line, which then runs westerly for 59 rods, more or less, to the northwest corner of the property, located on route 7.

For reasons noted below, the record description of the parties' common boundary line is affected by a latent ambiguity because its location on the face of the earth cannot be determined on the basis of the record description and because the location of some of the relevant monuments cannot be established. *See Lloyd v. Benson*, 2006 ME 129, ¶ 12, ___ A.2d ___, ___. In assessing the resulting question of where that boundary is located, the court is guided by the familiar principle that the location of a boundary on the face of the earth is a question of fact. *Hennessy v. Fairly*, 2002 ME 76, ¶ 21, 796 A.2d. 41, 48. Because a latent ambiguity exists here, the parcel's boundaries are located by reference to monuments, courses, distances and quantity, in that priority. *Id.* The parties' competing positions regarding the location of their common boundary lines are best depicted graphically in plaintiffs' exhibits 6 and 7. When their positions are distilled to their essence, the Merrills' contention is that the common boundary follows a barbed wire fence, and the Fosters argue that the line is located more northerly from its undisputed western terminus and runs parallel to the Merrills' northern line.

Here, the record description identifies several monuments that could be used to locate the parties' common boundary. Those monuments include: the iron pipe that, according to the deed description, should be located in the southwest corner of the

2

Merrills' parcel; the Merrills' northern boundary, which is parallel to their southern boundary (the one at issue here); and the lands of Bemis and Goulette, the western boundaries of which are the eastern boundaries of the Merrills' parcel. (An adjoining tract is a monument if it is identified as a boundary in the deed. *Snyder v. Haagen,* 679 A.2d 510, 514 (Me. 1996). Thus, the Merrills' northern boundary, and the Bemis and Goulette parcels are monuments.) There also are several distance calls in the deed that are relevant: the Merrills' southerly line distance of 59 rods (973.5 feet); and the length of their easterly line, 300 feet. Because the location of monuments is assigned greater probative value than record distances, the court considers the former first.

The monument that would provide possibly definitive guidance toward establishing the location of the parties' common boundary is the iron pin that, according to the deed, marks the easterly end of that line. However, several qualified surveyors have searched for that pin without results. Thus, the best evidence reveals that, despite Charles Merrill's testimony that he found the pin, it cannot be located. The location of the boundary must therefore be determined on the basis of other evidence.

The two other major monuments of significance here cannot be reconciled in a way that would allow them to point to a common conclusion. The Merrills benefit from reliance on the record reference to the land of Bemis. They urge that the disputed boundary line follows a barbed wire fence that ends at the westerly boundary of the Bemis' property. The Fosters' proposed line, however, ends at the northwest corner of the Bemis parcel; from there, the boundary of the Merrill property runs northerly, away from the Bemis property. Consequently, the Fosters' position excludes the westerly boundary of the Bemis property as evidence of the location of the parties' interests. On the other hand, the analysis adopted by the Fosters accommodates the other major monument, namely the Merrills' northerly boundary, because under their theory, the location of Merrills' southern boundary (which is common with their northern line) would run parallel to the former and is therefore determined by reference to that monument.

Although, as is noted above, there is legitimate factual support for the Merrills' position, the court is ultimately persuaded that the best evidence supports the contention that the parties' common boundary is on a line that runs parallel to the Merrills' northern

3

boundary, and that that common boundary is not located along the line marked by the barbed wire fence. Several factors support this conclusion. First, as is noted above, it honors the monument consisting of the Merrills' northern boundary. Second, the deed description of the southern line strongly suggests that it is a straight course, because it is said to run parallel to the northern boundary, which is straight, and because there is no record allowance for angles within that southerly line. However, the barbed wire fence does not run in a straight line. Rather, it actually consists of a series of ten runs, all of which have different bearings. The barbed wire fence also loses some significance because near the eastern end of the southerly line as depicted by the Merrills, that fence intersects with another wire fence that runs southerly and crosses onto land that indisputably is the Fosters'. Third, if the common boundary is located as the Fosters suggest, the length of the Merrills' easterly boundary is very close to the distance call of 300 feet found in the deed. On the other hand, because the eastern terminus of the common boundary urged by the Merrills is southerly of that point alleged by the Fosters, the Merrills' easterly line would be 134 longer than the distance prescribed in the deed. Even though distance calls are entitled to less weight than monuments, such quantitative information still has some importance, and here it supports the Fosters' allegation.

The court recognizes that this conclusion does not allow the Bemis boundary to serve as a monument, despite the record description. The boundary line offered by the Fosters ends at the northwest corner of the Bemis parcel. Thus, there would not be a common boundary between the Merrill and Bemis parcels. However, there is a point in common, and therefore there is some spatial connection between the two, even though it is not as extensive as the deed indicates. Further, although the court has also considered evidence that the barbed wire may constitute evidence that the Fosters' predecessors in title used land southerly of that fence, the probative force of occupation evidence is secondary to the more direct considerations of title noted above.[3] In this context, it bears note that the wire fence may be evidence of occupation but its mere presence is not

---

[3] Even if evidence of occupation, taken in the form of the location of the barbed wire, were more of a factor in the analysis than the court gives it here, its impact would not be significant because of competing evidence of occupation, namely, a woods road that runs along the Merrills' side of the boundary urged by the Fosters. *See* plaintiffs' exhibit 7.

4

evidence that its location marks the boundary, because a barbed wire fence is not typically used to mark a property line.

As an alternative to his unsuccessful allegation of record title, the Merrills also argue that they possess title to the disputed area by acquiescence.

In order to establish a boundary by acquiescence, a party must prove:
(1) possession up to a visible line marked clearly by monuments, fences or the like;
(2) actual or constructive notice to the adjoining landowner of the possession;
(3) conduct by the adjoining landowner from which recognition and acquiescence not induced by fraud or mistake may be fairly inferred;
(4) acquiescence for a long period of years such that the policy behind the doctrine of acquiescence is well served by recognizing the boundary.

The establishment of a boundary by acquiescence requires proof by clear and convincing evidence.

*Anchorage Realty Trust v. Donovan*, 2004 ME 137, ¶¶ 11-12, 880 A.2d 1110, 1112 (citation omitted). The Merrills have not established a high probability (that is, by clear and convincing evidence) that all of these elements are true.

The Merrills examine their acquiescence claim with reference to several portions of the disputed area. They first contend that the western end of the disputed land has been mowed as part of their own land holding in a way that establishes acquiescence by the Fosters and the Fosters' predecessors in interest. As a general matter, mowing an area of land is not sufficient to prove possession up to a visible line that is clearly marked by a monument. *See Dowley v. Morency*, 199 ME 137, ¶ 16, 737 A.2d 1061, 1067. Even, however, if one were to credit Charles Merrill's testimony that there had been a fence on the southern edge of the mowed area, thus providing evidence of a monument that has significance beyond a mere mow line,[4] the Merrills have not established that the

---

[4] Charles Merrill testified that there had been a fence along the southern edge of the mowed area but that the Fosters' predecessor in interest asked him to remove it. However, Merrill's credibility on boundary issues is weakened by the court's rejection of his testimony that he found a pin in the southeast corner of the disputed land. If such a pin were found there, it could only provide crucial evidence of the location of the disputed boundary. Merrill's testimony that he in fact located a pin at the end of the barbed wire fence is obviously very favorable to his case, but the record evidence makes it unlikely that there was a pin there. This finding casts doubt on other aspects of his testimony regarding boundary issues.

5

Fosters and their predecessors acquiesced to an act of dominion by the Merrills. An acquiescence claim requires proof to a high probability that the record owner was not mistaken about the location of the record boundary or that any history of the Merrills' predecessors mowing lawn that belonged to the Foster's grantor was more than, for example, neighborly beneficence. The mere fact that Merrill mowed a lawn area within a fence line is not a sufficient basis to establish, to a high probability, that the owners acquiesced to a particular boundary line. This is particularly true if, as Charles Merrill testified, the Fosters' predecessor, Annis, asked him (Merrill) to remove a fence that extended along the southern side of the mowed area. This fence appears to have been the western end of the fence that the Merrills have argued marks their southern boundary. Merrill did so. Although Merrill continued to mow the area that is now included in the disputed section of land, Annis' request for Merrill to remove the fence, which the Merrills now contend marked the boundary line, can be viewed as an expression of disagreement over that purported boundary location. This would be contrary to a form of acquiescence.

The Merrills also contend that their use of the middle section of the disputed area as an automobile junkyard constitutes an acquiescence to ownership by the Fosters and their predecessor. Further, they argue that the differing wood harvesting practices north and south of the fence line demonstrate that the Fosters and their predecessors have ratified the fence line as the boundary between the parties' land interests. The middle and eastern portions of the disputed land, however, had been used as a pasture for several years in the mid-1960's. Because the court has found that the barbed wire fence does not designate the boundary between the parties' parcels, the best explanation for the fence is agricultural. And because the barbed wire fence extends to the eastern end of the disputed area, it appears that the entire section had been used by one of the Merrills' predecessors as pasture. Further, because this area had been used for animals, it had been cleared. This explains why the area southerly of the fence has a different character of wood than the area inside the former pasture area, which showed no signs of harvesting since the time the pasture was created, until the Merrills engaged in some recent cutting. To the south of the fence, there had been several cuttings at different times within the past 30 years or so. The court does not treat differences in cutting practices as evidence

affecting title. Rather, it is a logical outgrowth of the fact that, for a limited period of time roughly 40 years ago, much of the disputed land had been used for a purpose that was different than the use to which the surrounding land was put. Beyond this, when the Merrills' predecessor put the land into pasture, the Fosters' predecessors cannot be seen to have acquiesced to a relocation of title, simply because the surrounding circumstances are not apparent in this record and because the amount of time when cattle were maintained in the pasture was relatively short and quite remote temporally.

Finally, the Merrill's establishment of a junkyard in the middle section of the disputed land does not support a conclusion of acquiescence by others. Charles Merrill began to develop that business in the late 1990's. As soon as the Fosters (Joseph Foster, in particular) learned in 2003 that there was a question about the location of the parties' common boundary, they took vigorous steps to protect his interests. These steps included issuing a written notice to the Merrills instructing to remove property from the disputed are and directing them not to enter the land that the Fosters contended was theirs. Due to the suddenness of this reaction, the court concludes that the Fosters had not been placed on notice that the Merrills claimed to own the disputed land, and the Fosters thus could not have acquiesced to such a claim or its associated use. For the same reason, when the Merrills harvested some trees from the eastern end of the disputed area, the Fosters or their predecessors did not have actual or sufficient constructive notice of that conduct. From Charles Merrill's description of that cutting operation, it was quite limited and not of such a magnitude that it either did or should have provoked a response from the Fosters or their predecessors in the absence of acquiescence.

For these reasons, the court concludes that the Merrills have not established by clear and convincing evidence that they have gained title to the disputed land by acquiescence of the Fosters and their predecessors in interest.

As part of their counterclaim, the Fosters seek an award of damages based on their claim that Charles Merrill trespassed onto their property. The Fosters have pursued this claim under both 14 M.R.S.A. § 7552 and the common law.[5] Maine caselaw that

---

[5] In their written summation, the Fosters have moved to amend their complaint to seek relief under section 7551-B. Because they have sought that amendment to a new statutory cause of action so late in this proceeding, the court denies the motion.

7

On count 3 of the counterclaim, judgment is entered for the defendants (counterclaim plaintiffs) in the amount of $1.

The defendants are awarded their costs of court.

Dated: November 15, 2006

Justice, Maine Superior Court
sitting in Maine District Court
Jeffrey L. Hjelm

CHARLES T MERRILL  - PLAINTIFF
1187 DEXTER ROAD
CORINNA ME 04928
Attorney for: CHARLES T MERRILL
CHARLES COX  - RETAINED 12/03/2003
COX LAW OFFICE
220 ELM STREET
PO BOX 327
NEWPORT ME 04953-0327


DIANE R MERRILL  - PLAINTIFF
1187 DEXTER ROAD
CORINNA ME 04928
Attorney for: DIANE R MERRILL
CHARLES COX  - RETAINED 12/03/2003
COX LAW OFFICE
220 ELM STREET
PO BOX 327
NEWPORT ME 04953-0327



vs
JOSEPH C FOSTER  - DEFENDANT
C/O CORINNA AUTO BODY 1167 DEXTER ROAD
CORINNA ME 04928
Attorney for: JOSEPH C FOSTER
CHARLES GILBERT III - RETAINED 12/03/2003
GILBERT & GREIF
82 COLUMBIA ST
PO BOX 2339
BANGOR ME 04402-2339


ROBERTA L FOSTER  - DEFENDANT
1167 DEXTER ROAD
CORINNA ME 04928
Attorney for: ROBERTA L FOSTER
CHARLES GILBERT III - RETAINED 12/03/2003
GILBERT & GREIF
82 COLUMBIA ST
PO BOX 2339
BANGOR ME 04402-2339


OPTION ONE MORTGAGE COMPANY - DEFENDANT
ONE PORTLAND SQUARE
PORTLAND ME 04101
Attorney for: OPTION ONE MORTGAGE COMPANY
DAVID DUNLAVEY  - REMOVAL 01/28/2004
PHILLIPS OLORE & DUNLAVEY
480 MAIN ST
PO BOX 1087
PRESQUE ISLE ME 04769-1087


Attorney for: OPTION ONE MORTGAGE COMPANY
CHARLES GILBERT III - RETAINED 01/23/2004
GILBERT & GREIF
82 COLUMBIA ST