243-11

STATE OF MAINE                    SUPERIOR COURT
WALDO, SS.                        CIVIL ACTION
                                  Docket No. RE-07-2


Steven Lucas,
       Plaintiff


       v.                         Decision and Judgment


Ralph Schmieder et al.,
       Defendants


       Plaintiff Steven Lucas and defendant Joanna Schmieder each own several parcels
of land that, in combination, abut each other. The parcels of land central to this action are
located in Searsmont. These parties dispute the location of several of the boundaries and
each seek declaratory judgments to establish those boundaries and, through that
determination, to resolve the question of ownership to the disputed property.
Additionally, Lucas pursues a claim for trespass and a claim to establish a prescriptive
easement in a way that crosses over land that he acknowledges is owned by Schmieder.[1]
Schmieder has asserted a claim against Lucas for trespass on the land that she claims is
hers. Trial was held on this matter, at which all parties were present with counsel. For
the reasons set out below, the court concludes that Lucas holds title to the property in
dispute, enters declaratory judgment to that effect and enters judgment for him on his
claim for trespass. The court also finds that Lucas has established a prescriptive
easement as he alleges.

       As a preliminary matter, the evidence reveals that defendant Ralph Schmieder
(Joanna's husband) does not have an ownership interest in any of the land at issue here.
Therefore, he is entitled to judgment on Lucas' claim against him for declaratory
judgment and a prescriptive easement, and judgment will be entered against him on his
claim for relief included in the counterclaim, which is comprised of legal contentions that

---

[1] Lucas' amended complaint also includes a claim for nuisance. He has not pursued or
otherwise pressed that cause of action, and so the court does not address it in this order.

1

are predicated on the existence of an ownership interest.[2] As is discussed below, however, Lucas alleges (and the court concludes that he has proven) that Ralph Schmieder trespassed onto his land, and so Lucas' trespass claim against Ralph Schmieder will be addressed on its merits.

The disputed parcels are located on the north side of Route 3 in Searsmont, near the Searsmont-Montville town line. The parties agree that Lucas owns land on the Montville side of the municipal boundary and that Schmieder owns a triangular shaped parcel (described during the hearing as the gore) on the Searsmont side of the line, easterly of and abutting Lucas' Montville property. Schmieder owns a separate parcel, located further east of the gore but, as the court concludes, not abutting the gore. Schmieder's residence is situated on this latter parcel, which the parties have referenced as the homestead parcel. Lucas owns a parcel located to the east of and abutting Schmieder's homestead parcel. The parties do not contest the ownership of any of these parcels. The principal dispute in this case focuses on the ownership of the land that is located between Schmieder's undisputed gore parcel and her homestead parcel. This contested parcel fronts on Route 3 and then extends in a northeasterly direction along the gore property and behind (in other words, northerly of) Schmieder's homestead property. Separate from the question of ownership and the location of the parties' boundaries, Lucas claims that he has a prescriptive easement over a gravel road that crosses over Schmieder's gore property and the disputed property (if Schmieder were found to be its owner). These are the central issues in dispute.

In 1990, Schmieder received a deed of title from Julia Hemstreet. The deed conveyed three parcels of land, including the gore and the homestead parcel.[3] The deed, *see* defendant's exhibit 2A, describes the gore as follows:

> A certain lot or parcel of land on the North Searsmont Road, Route 3 in Searsmont. . .; On the west by the town line; on the northeast and southwest by land of the heirs of F.C. Lucas and containing about fifteen acres.

---

[2] To distinguish between the defendants in this order, the court will refer to Joanna Schmieder by her last name because her role in this action is more prominent, and Ralph Schmieder will be referenced by his full name.

[3] The third is on the other side of Route 3 and is not at issue here.

2

The deed goes on to describe the homestead lot as follows:

Also another parcel on said North Searsport Road, bounded southeast by said road; southwest, northwest and northeast by land of the heirs of F.C. Lucas, called the homestead lot and containing about one-half acre.

It bears note that Lucas' property has been in his family since the late nineteenth century – well prior to the time these descriptions were created. Thus, as that property has been passed down through the family, it is evident that the references to the Lucas land are to the land owned by the plaintiff at bar.

These record descriptions for Schmieder's land have been used for these parcels since the time the Town of Searsport acquired them for unpaid taxes and then conveyed the parcels by quitclaim deed in 1937. Schmieder's essential argument is that the gore encompasses the disputed property and that, in effect, her land extends continuously from the town line (which is the western boundary of the gore) to the easterly end of the homestead parcel. For his part, Lucas argues that the disputed land has always been in his chain of title and that it was never encompassed in the chain of title that led to Schmieder's present holdings. Both Lucas and Schmieder claim the disputed land as his or her own: neither party argues -- and the record does not generate an issue -- that record title might lie with some third person. Therefore, the central issue to be resolved in this action is whether, based on the best available evidence, the disputed land is more likely to be Lucas' or Schmieder's. Subject to one of Schmieder's arguments addressed later in this order, the record in fact establishes that Lucas' land is in his chain of title and consequently that he is the record owner of the disputed property unless, at some point, it was acquired by one of Schmieder's predecessors in interest.

The location of a boundary on the face of the earth is a question of fact. *Hennessy v. Fairley*, 2002 ME 76, ¶ 21, 796 A.2d. 41, 48. The interpretation of a deed, however, is a question of law. *Lloyd v. Benson*, 2006 ME 129, 8, 910 A.2d 1048, 1051. If the facts extrinsic to the deed description are affected by a latent ambiguity, then a parcel's boundaries are located by reference to monuments, courses, distances and quantity, in that priority. *Id*. A "latent ambiguity" is "an uncertainty which does not appear on the face of the instrument, but which is shown to exist for the first time by matter outside the writing when an attempt is made to apply the language to the ground." *Slipp v. Stover*,

3

651 A.2d 824, 826 (Me. 1983) (punctuation omitted). An adjoining tract is a monument if it is identified as a boundary in the deed. *Snyder v. Haagen*, 679 A.2d 510, 514 (Me. 1996).

In the context of the record evidence, the keystone to determining the location of Schmieder's gore parcel is to establish whether it does – or does not – abut the homestead parcel. If the record descriptions and other material evidence reveal that the two parcels are contiguous, then the Schmieder necessarily owns the disputed land. On the other hand, Schmieder's two parcels do not abut each other if Lucas owns the land in between the two.

If, as Schmieder contends, her two parcels abut each other, then the easterly boundary of the gore would also constitute the westerly boundary of the homestead parcel: that are the lines where the parcels would meet. The description of Schmieder's two parcels goes far to establish that they do not abut each other and in fact are separated by land owned by Lucas. As is set out in the deed description, the gore is bounded by the North Searsmont Road (Route 3), the Searsmont-Morrill town line, and Lucas' property. As is set out in the other pertinent deed description, the homestead parcel is bounded by the North Searsmont Road (again, Route 3) and on all other sides by Lucas' property. These descriptions are significant in two ways. First, they reveal that neither of Schmieder's parcels is bounded by the other – in other words, they are not abutting parcels. Second, the descriptions establish affirmatively that the northeast and southwest bounds of the gore (that is, all boundaries except for Route 1 and the town line) are Lucas' property, and the southwest and northwest bounds of the homestead parcel also are Lucas' property. Lucas' property is a monument, and so to the extent that either of Schmieder's property descriptions is affected by a latent ambiguity, the reference to Lucas' property as a monument establishes that he owns the land in between Schmieder's two parcels, and the importance of the monuments (i.e., Lucas' property) to establish the location of Schmieder's parcels controls over the designation of the size of the gore lot as suggested in the deed description.

The conclusion that Schmieder does not own the disputed property is ultimately confirmed by the three surveyors who have had addressed that question. Two of those three surveyors, Randy Reynolds and Gusta Ronson, have performed on-site fieldwork in

4

an effort to determine the location of the boundaries at issue. Reynolds (who in fact was selected by Schmieder to survey the property) and Ronson both concluded that Schmieder's two parcels are separated by property owned by Lucas, in other words. Although they diverge in some aspects of their respective opinions about the location of the boundary lines,[4] they agree on the element of their opinion – that Schmieder's two parcels are not contiguous – that is most important here.

The third surveyor involved in this case is David Hutchinson. Hutchinson did not visit the site but rather reviewed relevant deeds and other records. He therefore does not have personal familiarity with the land and the features that are important to the issues raised in this action. However, based even on the limited information he reviewed, he reached a conclusion that was consistent with Reynolds' and Ronson's: that Schmieder's gore parcel does not abut her homestead parcel. *See* defendant's exhibit 6 (unnumbered page 4). Reynolds based this opinion on several facts. Those facts include the substance of the prior deed descriptions associated with Schmieder's two lots, which do not identify one as the boundary of the other and which do not use common lines, bearings or distances. Additionally, those earlier deeds conveyed an easement used as a means of access between the two parcels. As Hutchinson points out, if the two parcels abutted each other, an easement would have been unnecessary.

This, however, was not Hutchinson's final opinion. After he formed the opinion that Schmieder's two parcels are not contiguous, which is an opinion expressed in a report he issued in September 2006, Schmieder provided him with additional information that led Hutchinson to change his views and then conclude that in fact the two parcels do abut each other. That revised opinion is explained in a second report. *See* defendant's exhibit 7. Hutchinson changed his opinion based on two additional facts disclosed to him, at least one of which came from Schmieder. First, he was told that there had been a foundation for a structure located at the southerly end of the disputed parcel. Second, he

---

[4] Reynolds, for example, places the apex of Schmieder's gore parcel (which is the southerly end of the triangular shaped lot) at a point northerly of Route 3. Ronson, on the other hand, concluded that the apex extends to the road. Ronson's opinion on this issue is actually more favorable to Schmieder, because as Ronson locates the gore parcel, it contains a larger area than the parcel as Reynolds views it. This adds to the weight that the court assigns to the opinion evidence of Ronson, who was Lucas' witness.

was given further information about how the town taxed the parcels relevant to this case. It appears from Hutchison's second report that the first of these new data was, to him, the more significant of the two. In order to assess Hutchinson's revised opinion, the court considers these factual predicates underlying it, particularly the information about the foundation.

Schmieder attaches significance to the report of a foundation because of the terms of a 1820 deed in Lucas' chain of title. *See* plaintiff's exhibit F-3 (unnumbered page 4). The deed at issue, which conveyed property from Rufus Carter to John Milliken, is Lucas' source deed and encompasses much of the land at issue here.[5] That deed created two exceptions to the transfer.[6] The first exception was a half-acre parcel "which was deeded to Baptist Gilmane. . . ." The second exception was "one small house lut [sic] sold to Jonathan Philbrick. . . ." Because the conveyance from Carter to Milliken was subject to these exceptions, Milliken did not acquire the interests described in the exceptions, and Lucas could not have acquired those interests because his land derives from Milliken's title. The surveyors involved in this case have not uncovered any deeds recorded in or about 1820 conveying land to Gilmane or Philbrick, and to their knowledge, no one else has found such a deed. Further, no one has been able to locate either of the parcels described in those two exceptions.[7] As Hutchinson himself put it when he testified at trial, those parcels could be "anywhere" and virtually impossible to locate.

Nonetheless, Schmieder argues that there was a foundation located at the southerly end of the disputed property and that this foundation was associated with the small houselot that was excepted from the land that Milliken acquired from Carter. The

---

[5] Hutchinson's first report, defendant's exhibit 6, contains a helpful diagram of the land conveyed in that 1820 transaction. It appears as "sketch 2" at the end of that report. The larger lot A is the land that Carter conveyed to Milliken. As Hutchinson explained during his trial testimony, Schmieder's homestead parcel is located on both larger lot A and on lot C.

[6] It also reserved an easement, which does not bear on issues of title.

[7] As Hutchinson testified, Philbrick first appears as a grantee in 1821, but the property he acquired then is unlikely to have been the property referenced in the exception contained in the 1820 deed to Milliken.

court concludes that Schmieder's argument fails, because the evidence does not support either of the two claims that constitute this contention.

First, the evidence does not demonstrate persuasively that a foundation was present where Schmieder claims. Schmieder argues that the foundation had been present until early 2004, when it disappeared. Ralph Schmieder testified that it was roughly 40-feet off Route 3. However, Reynolds, the surveyor whom Schmieder first retained, worked on the property and issued a boundary survey in June 2004. There is no evidence that he saw a foundation or any sign that one had been there recently. Ronson also was present on the property, although it appears that this happened later. Nonetheless, she did not observe anything to suggest that there had been a foundation where Schmieder claims. Further, Gabriella Soohey, who testified as a defense witness, has lived in the immediate area for decades and did now know of a foundation. Finally, the record includes drawings prepared by the Department of Transportation when it improved Route 3. *See* plaintiff's exhibit G. As Ronson testified, these highway commission maps are most useful to locate monuments on or near the affected roadways. The map created in 1964, which was a time where, according to Schmieder, the foundation would have been present on the dispute land, does not show any such feature. The absence of a foundation shown on the map stands in contrast to other features beyond the right-of-way, such as a well, that the map does show. This evidence calls into significant question Schmieder's allegation that there was a foundation on the disputed property, and the court cannot find that there was a foundation as Schmieder alleges.

Second, even if a foundation had been there, the evidence is insufficient to warrant a conclusion that it marked the site of the excepted land that had not been conveyed to Milliken and therefore land that could not have devolved to Lucas. Hutchinson's testimony, which is the basis for Schmieder's theory, makes clear that the connection is speculative: he stated that the foundation "maybe" meant that the excepted land was the disputed property. In his revised report, *see* defendant's exhibit 7, he described this connection as "surmisal."

7

The court therefore finds that the disputed property was part of the land conveyed from Carter to Milliken and that it was not excluded from the chain of title that eventually rested with Lucas.[8]

Schmieder develops several other arguments that, she contends, demonstrate that the disputed land is hers and not Lucas'. First, she relies on municipal tax maps, municipal tax assessments, and DOT records. The court does not find that the information in these materials bears persuasively on the question of title. To the extent that they contain information about ownership, that untested information is only as good as the research that supports it and the competence of the people who developed it. Even Hutchinson, Schmieder's surveyor expert, explained that he usually attaches no weight to tax maps on questions of title. When the trial record contains boundary surveys prepared by licensed surveyors, and when it also contains opinions reached by those skilled professionals, any information to be drawn from those external sources is not entitled to meaningful weight. At the very least, this is demonstrated by the documentary changes made both by the Town of Searsport and DOT on the issues central to this case. For example, while an initial highway map prepared by DOT states that the disputed land was owned by Hemstreet, Schmieder's grantor, the map was subsequently changed to delete that suggestion of ownership. Further, at one point, the town's tax records indicated that Schmieder was the owner of the disputed land. The town then changed the ownership designation to "undetermined," and then back to Schmieder. The variability and ongoing changes of information at both governmental levels reveal that the information is of questionable accuracy and that the more thoughtful analysis of experts as developed at trial is far more probative.

Schmieder also argues that as shown in several deeds executed in 1840, there is a "gap in title" that vitiated all subsequent transactions that eventually led to Lucas' claimed acquisition of the disputed land. As is noted above, the source deed to Lucas'

---

[8] In the text of this order, the court noted that the three surveyors, including Hutchinson, "ultimately" concluded that Schmieder's two parcels are not contiguous. Hutchinson's opinion must be viewed in this way, because the facts do not support his revised opinion that the disputed parcel was not conveyed to Milliken and therefore now is owned by Schmieder. Because the factual predicate to Hutchinson's revised opinion is incorrect, his first opinion – that Lucas owns the land located between Schmieder's parcels – is the on that remains standing.

8

property was the 1820 conveyance from Carter to John Milliken. Five years later, in 1825, John Milliken conveyed the land to Seth Milliken and Mary Milliken. In 1840, Seth Milliken and Mary Milliken conveyed the land to Moses Milliken. However, four months later, in November 1840, John Milliken conveyed the same land to Rebecca Warren. This chronology suggests that in the November 1840 transfer, John Milliken purported to convey the same property that he had already conveyed to others. Because Lucas' title passes through Rebecca Warren's ostensible ownership of the disputed land, Schmieder argues here that Warren never acquired proper title to the property because in November 1840 it was not John Milliken's property to convey: rather, Schmieder argues that the property was Moses Milliken's and not John Milliken's. Ronson acknowledged this issue and discussed it during her testimony, and she also noted that there are no other arguable problems with the passage of title subsequent to 1840.

The court finds that this apparent gap in title is not of sufficient consequence to defeat Lucas' claim. The principal reason for this conclusion is that Moses Milliken never appears as a grantor, and there is no evidence that anyone else conveyed an interest in the property based on his acquisition of title in 1840. Further, there is no evidence that in the 170 years since that conveyance, anyone has made a claim to the property as a grantee, heir or other successor in interest of Moses Milliken. In other words, the course of title through Moses Milliken reaches a dead end. That John Milliken acted to convey the property in late 1840 tends to support Ronson's hypothesis that there was an intervening transfer that was not recorded or otherwise documented. The identity of surnames makes this prospect more likely, because it is suggestive of intrafamily transfers that might be made more casually than arms length transactions. Viewing the evidence in this way, the court concludes that the gap in title from 1840 does not defeat Lucas' claim today.

Schmieder's remaining argument of significance is that the land conveyed from Carter to Milliken did not include the disputed property, because the disputed property is bounded by Route 3 (identified in the older deed descriptions as the North Searsmont Road), and the descriptions in the source and subsequent deeds did not make reference to the way as a monument. Schmieder goes on to argue that if the property now owned by Lucas had been intended to extend to the road, the record description would have

9

included a reference to the road. The disputed land is included in the description of the property as set out in the 1820 deed. At that time, there may have been a way at the present location. However, it was not accepted as a public way until the late 1820's. Consequently, while the drafter of the deed could have used the then-non-public way as a monument in describing the property to be conveyed, its non-public status may have made it less significant in that context. Further, as Ronson testified, the description that was used largely conforms to the location of the road as a boundary. Therefore, the court does not treat the omission of a reference to the road in the record description as evidence that the property in fact did not extend to the road.

Schmieder has offered several other arguments in support of her claim to ownership and in defense of Lucas' claim. Among others, these include further challenges to Ronson's opinion and evidence of the size of the gore. The court has considered these remaining contentions and concludes that the weight of the evidence, taken as a whole, provides strong support for Lucas' fundamental claim that he is the record owner of the property at issue. The court further finds that the best evidence substantiates Ronson's opinion about the location of the boundaries for the property owned by Lucas and Schmieder, as shown in plaintiff's exhibit C.[9] The court therefore adopts that survey (plaintiff's exhibit C) as the determination of the property lines at issue in this action.

Lucas has asserted a claim that both Joanna and Ralph Schmieder have entered onto the disputed land. Because the court has now found that Lucas owns that land, the court next considers his trespass claim against them, which he has presented as (and the court treats as) a common law cause of action.

Adopting the formulation of common law trespass found in the Restatement (Second) of Torts, the Law Court has held that a person is liable for common law trespass "'irrespective of whether he thereby causes harm to any legally protected interest of the

_____

[9] During her testimony, Ronson was careful to point out that because Lucas hired her to locate the boundary lines for his property, she did not make any judgments about Schmieder's title. Nonetheless, in the context of the claims at bar, her identification of Lucas' property lines serves as a corresponding identification of Schmieder's boundaries as they relate to Lucas', and the court used her survey (plaintiff's exhibit C) to depict the relevant boundaries of both parties' land.

other, if he intentionally enters land in the possession of the other. . . .'" *Medeika v. Watts*, 2008 ME 163, ¶ 5, 957 A.2d 980, 982, *quoting* RESTATEMENT (SECOND) OF TORTS (Restatement) § 158(a) (1965). The mere fact of an unprivileged entry onto land amounts to the actionable conduct. *See* Restatement § 158, cmt. c. The intentional quality of the actor's conduct is simply the intent to enter onto the land and does not include an intent to invade the interest of the claimant. *Id.* § 163. Therefore, under common law principles, the actor is liable for trespass "irrespective of whether the actor knows or should know that he is not entitled to enter," and even when "he honestly and reasonably believes that the land is his own. . . ." *Id.*, cmt. b. Further, where the actor "acts under a mistaken belief of law or fact. . .that he is in possession of the land or entitled to it," he is nonetheless liable for the intentional entry onto that land. *Id.* § 164(a). These legal principles demonstrate that Joanna and Ralph Schmieder are liable for trespass onto the disputed land, despite their sincerely held belief that Joanna Schmieder held title to that land.

The evidence establishes that both Joanna Schmieder and Ralph Schmieder entered onto the disputed parcel. Joanna Schmieder has walked through the land to enjoy its environment. Ralph Schmieder mows the edge of the disputed area closest to the road and he has placed "no trespassing" signs on the property. The defendants have also placed a trailer on that property. These activities constitute trespasses because they were intentional entries onto Lucas' property.

Lucas freely testified that he does not claim any damages caused by those trespasses.[10] A person in possession or ownership of property is presumed to sustain some damage from the invasion of a legally protected property right. *Medeika*, 2008 ME 163, ¶ 5, 957 A.2d at 982. In the absence of actual damages, Lucas is entitled to judgment on his claim against both defendants for trespass, and he is entitled to an award of nominal damages. *See id.*, 957 A.2d at 982.

Schmieder's counterclaim includes a count for trespass, which is based on evidence that Lucas cut trees on property that Schmieder claims is hers. The evidence

---

[10] This disclaimer of any loss may be seen as generous, because both the placement of a trailer on the disputed parcel and removal by one or both defendants of some limbs from trees could form the basis for a claim of actual damages.

11

certainly does establish that Lucas harvested trees, but Schmieder has not proven that he cut the trees from her land. Rather, to the extent relevant to this action, Lucas harvested trees from the area that had been in dispute and that the court now finds is his. Therefore, judgment on Schmieder's trespass claim will be entered in favor of Lucas.

Finally, Lucas alleges that he has a prescriptive easement that crosses over the gore toward the northerly end of that parcel. There exists a private road that intersects with Route 3 on Lucas' property east of Schmieder's homestead parcel. The road proceeds northerly across Lucas' property and then bends to the west, passing over the gore and then continuing onto Lucas' land, crossing over the Searsmont-Montville town line and then continuing over and beyond Lucas' land that is located in Montville. The approximate location of the road is shown on the Ronson surveys, plaintiff's exhibits B and C. Here, Lucas claims an easement interest over that section of the road that passes over Schmieder's land.

In order to establish the existence of a prescriptive easement, the claimant must prove the following three elements by a preponderance of the evidence: (1) continuous use of the servient estate for at least twenty years; (2) use under a claim of right adverse to the owner; (3) use with the owner's knowledge and acquiescence, or a use so open, notorious, visible, and uninterrupted that the owner's knowledge and acquiescence will be presumed. *Androkites v. White*, 2010 ME 133, ¶ 14, 10 A.3d 677, 681. As the proponent of the easement claim, Lucas bears the burden of proving these elements by a preponderance of the evidence. *See Glidden v. Belden*, 684 A.2d 1306, 1317 (Me. 1996). The court examines these elements of a prescriptive easement claim sequentially and concludes that Lucas has established the existence of the easement that passes over the gore.

Lucas must first establish that there has been a continuous use of the way for at least twenty years. "Continuous" use means use without interruption. *Stickney v. City of Saco*, 2001 ME 69, ¶ 18, 770 A.2d 592, 601. However, "[c]ontinuous possession and use requires only the kind and degree of occupancy (i.e., use and enjoyment) that an average owner would make of the property." *Id.*, 770 A.2d at 601. Here, Lucas' father constructed the road in the late 1960's. He and others assisting him cleared the way through the wooded areas, removed rocks, installed culverts, and imported and spread

12

gravel. Over time, Lucas and other family members have maintained the road by adding gravel, replacing culverts and adding new ones. An employee of Lucas Construction, the family business, hauled in gravel with a dump truck and used a dozer to spread it out.

Lucas, members of his family and others have used the road in different ways. Because the way extends to the back part of Lucas' Montville property, he uses it as a way to gain access. Additionally, the road continues and to connect with other woods roads located on properties owned by other members of the Lucas family. They and other persons, both known and unknown, use the roads for hunting. Most winters after Lucas acquired the property,[11] he plowed the road. Additionally, Lucas and other members of his family over time have cut trees and have driven large trucks, including tractor-trailers, on the roads to haul the trees off the property. In fact, an abandoned pulp truck still sits on Lucas' land adjacent to the road and has been there for more than twenty years. *See* plaintiff's exhibits K1-K4. Although the truck is not on Schmieder's property, its presence is evidence of one of the ways the road has been used. At least some of that wood was cut on land located in Montville, which means that the trucks were driven over the portion of the road located in Searsmont, which in turn includes the part of the road that passes over Schmieder's land.

This evidence establishes that the road has been used regularly and continuously, without interruption, for well more than two decades. That use is clearly consistent with the way one would expect a woods road to be used, because those uses include both recreational and commercial. In particular, Lucas or members of his family would not have invested the effort and expense of improving the road with the use of heavy equipment and quantities of gravel, if the road was used sparingly. Lucas has therefore established the first element of a prescriptive easement claim.

Next, Lucas must prove that during the prescriptive period, the road has been used under a claim of right adverse to the owner. This means a showing that "a party uses the

---

[11] At trial, Lucas testified that he has lived on the property since 1972, which is when he built his house, and the court accepts this testimony. Lucas' testimony may also suggest that he acquired the land in 1972. However, he deed conveying the property to him was executed in 2003. Any discrepancy in the date of transfer of title is not material, because the property at issue has been in Lucas' family for more than a century, including the entire prescriptive period, during which Lucas himself, members of his family and others outside of the family have used and maintained the road.

land as though he owned the property himself and without the owner's permission." *Taylor v. Nutter*, 687 A.2d 632, 634 (Me. 1996) (citation and internal punctuation omitted). Where the use has been "open, unmolested, and continuous. . .for the prescribed period with the knowledge and acquiescence of the owner, such use is presumed to have been adverse." *Stickney*, 2001 ME 69, ¶ 21, 770 A.2d at 602.

The evidence that demonstrates the continuous use of the road also establishes that the use was adverse to Schmieder and her predecessor, Julia Hemstreet, thereby covering the prescriptive period. (Hemstreet acquired the property in 1946 and conveyed it to Schmieder in December 1990.) As is noted above, the road was used regularly for various purposes. Users drove different types of equipment on the road, including snowmobiles, all terrain vehicles, plow trucks and trucks to haul logs. This evidence, taken as a whole, shows that Lucas and his predecessors in title used the road passing over Schmieder's gore parcel as it were their own property – and in fact, Lucas and other members of his family used that portion of the way in the same manner that they used the portions of the road passing over the own property that Lucas now owns. Additionally, neither Lucas nor anyone on his behalf sought or obtained permission from Schmieder to use the way. Ralph Schmieder testified that once he told Lucas or members of the Lucas family not to use the road. The evidence shows that they continued to do so. Further, Lucas put up a locked gate near the end of the road closest to Route 3. He did this because too many hunters were using the road. Lucas maintains possession of the key to the gate. The gate had the effect of limiting access to that part of the road that passes over Schmieder's land. In this way, he is treating that part of the road as his own, because he is the one who maintains control over its use.

While this evidence constitutes direct proof of adverse use, the evidence also creates the presumption of adverse use described in *Stickney*, because Lucas and others used the road in an open, unmolested and continuous way with Schmieder's knowledge and acquiescence. Although Ralph Schmieder protested about Lucas' use of the road, that objection did not affect that use. Schmieder herself testified that she finds great enjoyment walking through the woods and does it frequently. Because of the nature of Lucas' use of the road and Schmieder's proximity to it, the court finds that Schmieder had knowledge of activities on the road to a degree sufficient to establish this part of

14

Lucas' claim. Despite this knowledge, the activity continued even after Lucas was asked to stop. This amounts to implicit acquiescence. Based on this evidence, the court finds that Lucas has proven that his use of the road was adverse.

Finally, Lucas must prove that he used the road with the Schmieder's knowledge and acquiescence, or that he used the road in such an open, notorious, visible, and uninterrupted manner that Schmieder's knowledge and acquiescence will be presumed. Acquiescence is a form of "passive assent to the claimant's use, as distinguished from the granting of a license or permission given with the intention that the licensee's use may continue only as long as the owner continues to consent to it." *Taylor*, 687 A.2d at 635. The evidence establishes this last element of the claim. The evidence demonstrates affirmatively that Schmieder did not give Lucas permission or authorization to use the way as it passed over her land, and no one obstructed the use made of the road by Lucas or others. In fact, as is noted above, Ralph Schmieder told Lucas to stop using the road, but Lucas persisted in using it anyway. Further, there is no evidence that Hemstreet gave Lucas or others permission to use the portion of the road at issue.

Additionally, the circumstances of that use during the prescriptive period generate the presumption of knowledge and acquiescence. As is discussed above, the character and extent of Lucas' use of the road can only have put Schmieder and Hemstreet on notice of Lucas' activity. That use was open, notorious, visible and continuous. Except for Ralph Schmieder's one protest, Schmieder and Hemstreet before her tolerated that use without authorizing or consenting to it.

Based on this evidence, the court finds that Lucas has proven that he has proven the elements of his claim and concludes that Lucas has a prescriptive easement within the road that passes over Schmieder's property.

The entry shall be:

For the foregoing reasons, judgment on the complaint is entered for the plaintiff. The court finds and declares that the boundary lines of the parties' parcels of property, described in deeds recorded at book 1201 page 295 (deed to Schmieder) and book 2483 page 328 (deed to Lucas) are as depicted in a survey dated March 7, 2007, prepared by Good Deeds, Inc., admitted into evidence as plaintiff's exhibit C and incorporated by reference herein.

15

On the plaintiff's claim for trespass, judgment is entered for the plaintiff and against the defendants in the amount of $1.

The court finds and declares that the plaintiff has a prescriptive easement within an existing road that crosses property owned by defendant Joanna Schmieder, described in the above-referenced deed.

On the counterclaim, judgment is entered for the plaintiff (the counterclaim defendant).

The plaintiff is awarded his costs of court.

Dated: June 22, 2011

_____
Justice, Maine Superior Court