STATE OF MAINE                                    SUPERIOR COURT
YORK, ss.                                         Civil Action
                                                  Docket No. CV-16-0158


GLENN F. KING and JULIE A. KING,      )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )
                                      )          FINAL JUDGMENT
JAMES H. WELCH,                       )             AND ORDER
                                      )          (Title to Real Estate Involved)
            Defendant.                )
                                      )


      Glenn F. King and Julie A. King filed this action against James H. Welch seeking

(i) a declaration of the boundaries of, and their rights in, a common right-of-way they

share with Welch; (ii) an injunction requiring Welch to remove trees and a fence alleged

to be in the right-of-way; and (iii) damages for trespass under 14 M.R.S. § 7551-B(2).

Welch filed counterclaims for declaratory relief and compensatory damages.

      A non-jury trial was held over three days in August 2019. Prior to trial, the court

took a view of the area at issue. At trial, the court heard testimony from Julie King,

Glenn King, Lisa Welch, James Welch, Drazenko Rakovic, Mack McLaskey, and two

experts, Peter Deletetsky, P.L.S., and Richard W. Eaton, P.L.S. Following trial, counsel

submitted proposed findings of fact and conclusions of law. On the basis of the evidence

presented, the court finds, concludes, orders, and adjudges as follows.

## I. Findings of Fact

### A. The Parties' Lots and Right-of-Way

      1. Glenn and Julie King own and reside at property located on Blunt Road in

Saco, Maine, which they purchased in 1990 from John Jacques LaCroix. Their deed

described the property as:

1

> A certain lot or parcel of land, together with any buildings and improvements thereon, located northeasterly of the Buxton Road, but not adjacent thereto, in the City of Saco, County of York, State of Maine, said parcel of land being more specifically identified as Parcel "E" as shown on plan entitled "Plan of Land of Heirs of Jacques J. LaCroix, located in Saco, Maine", dated September 1982, drawn by Paul E. Theberge, Registered Land Surveyor #105, recorded in the York Registry of Deeds in Plan Book 120, Page 30 to which plan and the record thereof reference is hereby made for a more particular description.

(Pls.' Ex. 2). The plan referenced is Plaintiffs' Exhibit 1 ("LaCroix Plan").

2. The 1990 LaCroix-to-King deed also conveyed to the Kings "a right-of-way 30 feet in width in each and every part as shown on said plan, and further granting a right-of-way to the Buxton Road . . . ." (*Id.*).

3. Access to Lot E from the main road is depicted in the LaCroix Plan as a "30' R.O.W to Buxton Rd," known then as Fire Lane 13 (and now as Blunt Road), which runs roughly southwesterly to northeasterly; turns easterly approximately 45 degrees between Lot A and Lot B; and then splits, with one part continuing easterly and the other heading more southerly toward the land that became Lot E.

4. This latter portion of the right-of-way leading to Lot E is depicted on the LaCroix Plan as an "L-shaped," 30-foot-wide right-of-way beginning opposite Lot B and proceeding between Lot B-1 on one side and Lots A and D on the other, which then turns 90 degrees to the left to run between Lot B-1 and Lot E and ends at the McInnis land bordering Lot E to the east (hereinafter specifically referred to as the "Right-of-Way").

5. In 1990, at the time of purchase, Lot E consisted of raw land, described by Glenn King as "barely a field and some woods . . . stripped [of] all the topsoil." There was no distinct path leading from Fire Lane 13 to Lot E at that time.

6. Brenda Rand previously owned Lot B-1 and Lot D as shown on the LaCroix Plan. In 1995, the Kings purchased Lot D from Brenda Rand. (Def.'s Ex. 7.)

2

7. In 1996, James Welch purchased Lot B-1 as referenced in the LaCroix Plan and the house thereon from Brenda Rand. The deed also conveyed "a right of way thirty (30) feet in width in each and every part as shown on said Plan and further granting a right of way to the Buxton Road . . . ." (Def.'s Ex. 6.) The current driveway of Lot B-1 is on the west side (front) of the house, and is accessed directly from the Right-of-Way.

8. Both the King and Welch lots had been part of a larger parcel of land previously owned by James J. LaCroix, as depicted in a May 2, 1976 Sketch of Land ("Drouin Sketch"). (Pls.' Ex. 18.) The Drouin Sketch shows six lots delineated on the west side of the parcel—Lots A, B, B-1, C, D & E—and a larger, undivided portion of the parcel to the east described as Lot F.

9. The initial out-sale from the LaCroix parcel was a conveyance of two lots from Jacques LaCroix to Bertha McInnis by a 1980 deed. (Pls.' Ex. 17.) One lot was contiguous to Lot E on its east side (the "McInnis Lot"). (*See id.*; Pls.' Ex. 2.)

10. The LaCroix-to-McInnis deed conveying the McInnis Lot sets out the following metes and bounds description, beginning by reference to a fixed monument on the face of the earth:

> *BEGINNING at a point which is located North 51°53' East 255 feet from an iron pipe* located on the Southerly corner of premises conveyed to the Grantor by Deed of Frank W. Wormwood, dated October 1, 1943, recorded in the York County Registry of Deeds in Book 1013, Page 21, said iron pipe also located at the Easterly corner of land now or formerly of one McClintock.

(Pls.' Ex. 17.) (Emphasis added.)

11. The iron pipe referenced by the deed as "located on the Southerly corner" is, in fact, the same iron pipe monument located on the face of the earth today at the southerly corner of Lot E. Plaintiffs' expert, Peter Deletetsky, P.L.S., found this corner monument in the field as well as two additional iron pipe monuments located approximately 190 feet and 380 feet, respectively, from the corner iron pipe referenced

3

above. These monuments form a line running northwesterly from the corner iron pipe towards Blunt Road. Mr. Deletetsky testified that this line constitutes the southwesterly boundary of Lot E and Lot D. As that line is extended further northwesterly towards Blunt Road and parallel to the longer segment of the Right-of-Way, it forms the southwesterly boundary line of Lot A. Defendant's expert, Richard W. Eaton, P.L.S., concurred as to the existence and location of the monument in the southerly corner of Lot E as well as the other two monuments falling on said southwesterly boundary line.

12. The LaCroix Plan depicts Lot E's portion of the foregoing southwesterly boundary as running 200 feet from the corner iron pipe to a "plastic stake set";[1] its perpendicular southeast boundary as running 255; and the full dimensions of Lot E as 200-by-255-foot rectangle. The shorter segment of the Right-of-Way separates, and lies between, Lot E and Lot B-1. These boundaries are confirmed in the survey prepared by Mr. Deletetsky ("Dow & Coulombe Plan"). (Pls.' Ex. 16; Def.'s Ex. 29).

13. The LaCroix Plan shows (i) Lot D's common boundary with Lot E and with Lot A to be 125 feet wide, as measured from the foregoing southwesterly border of Lots E and D; (ii) Lot B-1 to be 100 feet wide, as measured from the southwest boundary of the McInnis Lot; and (iii) the Right-of-Way lying between Lots A and D on one hand and Lot B-1 on the other to be 30 feet wide. Thus, the 125-foot width of Lot D (or the portion of Lot A opposite Lot B-1) plus the 100-foot width of Lot B-1, when added to the 30-foot width of the Right-of-Way, equals the 255-foot width of Lot E.

14. Richard Eaton identified what he believes to be a 20-foot scaling error in the LaCroix Plan. Mr. Eaton testified that the effect of this error is that the actual

---

[1] As it lies on the face of the earth, the plastic stake in question was slightly off-line and approximately 10 feet beyond the iron pin sitting 190 feet from the southerly corner of Lot E that roughly corresponds with the metes and bounds description in the LaCroix-to-King deed. Peter Deletetsky placed an iron (rebar) pin to mark this spot, which is the westerly corner of Lot E.

4

boundaries of Lot B and Lot C (and all other lots in the subdivision) are, on the face of the earth, 20 feet closer to the Buxton Road (that is, shifted 20 feet southwesterly). Mr. Eaton's opinion is based on his identification in the vicinity of the triangular Lot B on the opposite (north) side of Blunt Road that does not align with the scale of the LaCroix Plan.

15. This scaling error does not affect the location on the face of the earth of the monument shown on the LaCroix Plan ("Existing I.P.) that marks the distance from that point to the Buxton Road as 726 feet. This monument is more or less directly across Blunt Road from the terminus of the southwesterly boundary line of the former LaCroix land (which is also Lot D and Lot A's southwesterly boundary).

**B. The Road**

16. After purchasing the property, the Kings needed to build a road from Fire Lane 13 to Lot E. They hired Scott Poulin to construct a gravel road in the longer segment of the Right-of-Way. Poulin obtained an easement to enable CMP to install poles and power lines. A considerable amount of fill was used to build the road.

17. Glenn King assisted in siting the location of the Right-of-Way and the placement of the road therein. He did not use a surveyor. He relied on the LaCroix Plan in addition to information from a former resident in the area, Paul Brewer, as to the existence and location of certain monuments believed to demarcate the northeasterly boundaries of Lot A and Lot D. Having established what he believed to be the boundary lines of Lots A and Lot D, Mr. King measured the length and width of the Right-of-Way.

18. As constructed, the road was approximately 16-feet wide, covering only a portion of the Right-of-Way. At the time, Mr. King believed the 16-foot road to be centered in the middle of the Right-of-Way. In fact, the road as constructed occupied

5

primarily the southwestern portion of the Right-of-Way and cut across the corner of Lot D where it abuts Lot E. (*See* Pls'. Ex. 16.)

19. In May 1993, a modular home was transported over the road to Lot E in two sections. The road was wide enough to accommodate the large tractor truck and the sections of modular homes being hauled. (Pls.' Ex. 3, 5.) In July 1993, the Kings moved into the home on Lot E.

20. The parties stipulated that pursuant to 33 M.R.S. § 469-A(6), each party owns the fee of half of the real property burdened by the right of way, specifically the area between the edge of the right of way bordering their respective properties to its centerline. They also stipulated that the City of Saco has not accepted the Right-of-Way.

21. Several neighbors agreed to pave portions of Blunt Road and share in the cost. Both parties paid a portion of the paving cost. Mr. King was present at the time the paving was done and expressed approval. Paving the area of the intersection where the Blunt Road turns toward Lot E was primarily the idea of a neighbor, Mr. Rakovic, who lives on Lot A and was concerned about water pooling in that location.

22. Defendant paid extra to have his driveway paved and extend the paving onto the Right-of-Way up to a point just beyond the driveway in front of his house. The paving covered the entire surface of the gravel road up to that point, including the portion of the road that lies southwesterly of the centerline. There is no credible evidence that paving the Right-of-Way caused damage to plaintiffs' property.

**C. The Fence and Trees**

23. In 1998, Welch planted two white pine tree saplings along the road in front of his house on the northwest side of his driveway and then installed a fence between

6

the two pine trees. Before doing so, Welch informed Glenn King of his intention, and King gave him two pine saplings from his (King's) land.

24. Because there were no survey markers delineating the boundary of the Right-of-Way at the time, Welch spoke to Mr. King, who said that the road was put in the center of the Right-of-Way. Welch relied on this information from Glenn King, and measured 15 feet from the center of the road in siting the location for planting the pine trees and installing the fence. Mr. King complimented Welch on the work shortly after its completion.

25. The Kings were aware of the location of the fence and two pine trees from the time they were installed. Welch also cultivated a narrow strip of grass in front of the fence.

26. In 2000, Welch planted a row of thirteen *arborvitae* trees along the road roughly in line with the fence and two pine trees. Glenn King had seen the trees lying on the ground before being planted and offered assistance in planting them.

27. Welch planted the *arborvitae* trees in order to enhance privacy and reduce noise and dust from the road. Welch also installed a stone planter between the first *arborvitae* tree and the driveway. A portion of the stone planter was in line with the trees.

28. In 2002, Welch planted additional *arborvitae* trees, extending the row of trees further southeast in line with the first batch along the road (i.e., toward the King property). The Kings were aware of and observed the planting of the second batch of *arborvitae* trees.

29. The fence, two pine trees, front part of the stone planter, and *arborvitae* trees were installed roughly along the same line approximately 15 feet from the centerline of the road. Based on his conversations with Glenn King, Welch believed the road had

7

been placed "dead center of the right-of-way," and therefore measured 15 feet from the centerline of the road (not the centerline of the Right-of-Way) to determine placement of these items.

30. However, based on the Dow & Coulombe Plan, which the court finds to be an approximate depiction of the location of these items on the face of the earth, these items actually fall within the Right-of-Way, that is between its centerline and its boundary with Lot B-1.

31. Plaintiffs' first objected in writing to the fence, pine trees, and *arborvitae* trees in April 2016; they did not mention an objection to paving of the road.

32. Testimony conflicted as to whether or not the Kings had objected directly to Welch about placement of any of these items in the Right-of-Way at the time of installation or shortly thereafter. In light of the record as a whole, the court does not find credible testimony that the Kings had voiced objections at the time these items were installed nor at any time until years later.

33. Relations between the parties eventually soured over placement of the fence and trees, with the Kings asserting that these items were in the Right-of-Way and demanding their removal. At one point, Julie King began intentionally driving over the grass lawn in front of the fence. Defendant put bricks and logs at various times on the grass in front of the fence to deter Ms. King from driving over the lawn but removed them.

34. The Right-of-Way is widest at the point where it turns from the main road out to Route 112 and up to defendant's driveway. The fence and two white pines have not impeded, and do not today impede, vehicular access to plaintiffs' property at Lot E.

8

35. Beyond defendant's driveway, the travelled road serves only Lot E. The stone planter and row of *arborvitae* trees have not impeded, and do not today impede, vehicular access to plaintiffs' property at Lot E.

36. There is no evidence that the Right-of-Way had ever been used as a two-lane road.

37. Vehicles other than those belonging to plaintiffs have regularly used the Right-of-Way without obstruction or impediment, including oil trucks, FedEx trucks, construction vehicles, and a tractor-trailer truck. Both Mr. Rakovic and Mr. McLaskey, neighbors who have plowed snow on the paved and gravel road, have not been obstructed by the fence or the trees.

38. The *arborvitae* trees planted nearly twenty years ago have grown to maturity. There is a strip of grass between them and the gravel road. In their present state, they occupy entirely the space between that grass strip and the northeasterly boundary of the Right-of-Way and thus impede passage over that portion of the Right-of-Way.

39. Even in winter, the *arborvitae* trees do not impede ingress or egress to plaintiffs' property. After a heavy snowfall, though, *arborvitae* tree limbs may become weighed down so as to draw them over, and partially into, the northeasterly side of the travelled road. But this does not obstruct the road or prevent access to the King property. (See Def.'s Ex. 25.) Mr. Rakovic testified, however, that on one occasion he believed the snow-laden limbs could have scratched his truck if he drove by.

40. Defendant has tied the *arborvitae* trees with nylon rope to prevent their boughs from spreading.

9

## II. Conclusions of Law

## A. Count I of the Complaint: Declaratory and Injunctive Relief

### 1. Ownership to Centerline of Road

As stipulated by the parties, the court concludes that plaintiffs Glenn and Julie King and defendant James Welch each succeeded to ownership to the centerline of the Right-of-Way from their respective lots, and hold title thereto. There is no evidence that the original developer reserved ownership of the Right-of-Way, which was not accepted as a municipal way. *See* 33 M.R.S. §§ 465, 469-A; 23 M.R.S. §3031(2). The Right-of-Way is a deeded easement over the parties' lots.

### 2. Location of Easement, Fence, and Trees

The intended location of an easement is a question of law based on deed language and any recorded plan referenced therein. *French v. Estate of Guzman*, 2015 ME 152, ¶ 7, 128 A.3d 657; *Anchors v. Manter*, 1998 ME 152, ¶ 16, 714 A.2d 134. There is no dispute as to the existence of the deeded 30-foot Right-of-Way. The relevant deeds together with the incorporated LaCroix Plan describe the dimensions and layout of the lots and the Right-of-Way. The parties dispute, however, the precise location of the Right-of-Way's boundaries on the face of the earth. Where a boundary lies on the face of the earth is a question of fact. *Hennessy v. Fairley*, 2002 ME 76, ¶ 21, 796 A.2d 41. The party asserting its location has the burden of proof by a preponderance of evidence. *French*, 2015 ME 152, ¶ 19, 128 A.3d 657.

Plaintiffs have established that it is more likely than not that the Right-of-Way lies on the face of the earth between Lot B-1 and Lots A/D as depicted on the Dow & Coulombe Plan. The southwesterly boundary of the original LaCroix parcel, which constitutes Lot E and Lot D's southwesterly boundary, lies on the face of the earth where depicted by the Dow & Coulombe Plan. The southwesterly boundary of the Right-of-

Way (which is the boundary between the Right-of-Way and Lot D) sits on the face of the earth 125 feet from and parallel to Lot D's southwesterly boundary. The boundary line between the Right-of-Way and Lot B-1, therefore, sits 30 feet from, and parallel to, this latter boundary line as depicted in the Dow & Coulombe Plan.

The 20-foot scaling error identified by Richard Eaton does not impact the location of the boundaries of the relevant lots or the Right-of-Way, all of which lie on the other (south) side of Blunt Road and which, for purposes of the issue before the court, derive from the southwesterly boundaries of Lot E, Lot D, and Lot A. Moreover, even if the boundaries of Lot B and Lot C are shifted southwesterly (that is, toward the Buxton Road) by 20 feet, the location of the monument marking the distance of 726 feet from the Buxton Road remains unaltered; and this monument aligns with the southwesterly boundaries of Lot D and Lot A across Blunt Road.

Given the location of the Right-of-Way as established above, it is more likely than not that the fence, the two white pine trees flanking the fence, a portion of the stone planter, and the row of *arborvitae* trees are all located within the bounds of the 30-foot Right-of-Way as depicted in the Dow & Coulombe Plan. Defendant has title to the land comprising the portion of the Right-of-Way on which each of the foregoing items is situated.

### 3. Extent of Interference

As a general rule, if the boundaries of an easement are expressly set by the grant, the owner of the right-of-way is entitled to use the entire granted area. *Stanton v. Strong,* 2012 ME 48, ¶ 10, 40 A.3d 1013; *Mill Pond Condominium Assoc. v. Manalio,* 2006 ME 135, ¶ 6, 910 A.2d 392 (*Mill Pond I*). A corollary to this rule is that the owner of a servient estate "may not materially impair, or unreasonably interfere with, the use of a right of way." *Flaherty v. Muther,* 2011 ME 32, ¶ 63, 17 A.3d 640 (quoting *Morgan v. Boyes,* 65

11

Me. 124, 125 (1876)) (internal quotation marks omitted); *Badger v. Hill*, 404 A.2d 222, 227 (Me. 1979) (deciding that the servient estate cannot interfere with the dominant estate holder's "effective use" of the easement).

The question presented is whether the fence and trees that were installed by defendant and fall within the bounds of the Right-of-Way constitute unreasonable interference with plaintiffs' use of the Right-of-Way for its intended purpose. The fundamental purpose of the Right-of-Way is, and has been, to provide access to the lots it serves. Even though the fence and trees are located within the bounds of the Right-of-Way, and in the case of the *arborvitae* trees, preclude use of that portion of the Right-of-Way altogether, they have not materially impaired or unreasonably interfered with access to the lots.

Courts have closely examined the particular factual circumstances in cases such as this in order to determine whether an owner's use rights in an easement have been actually frustrated or materially impaired, as illustrated by *Stanton* and *Mill Pond I* themselves, which fall on opposite ends of the factual spectrum. In *Stanton*, the servient estate owner "placed boulders, a pile of three-to-six inch crushed rock, and fence posts . . . that *blocked access to [plaintiff's] property*." *Stanton*, 2012 ME 48, ¶ 5, 40 A.3d 1013 (emphasis added). In *Mill Pond I*, however, owners of a deeded right-of-way "for purposes of ingress and egress" to their property did not have the right to insist on removal of a sign placed in the corner of the 42-foot wide right-of-way because "the space taken up by the fee owner's sign *did not, as a matter of fact, interfere with the [easement holder's] ingress or egress* across the easement." *Id.* ¶ 7 (emphasis added).

This case falls somewhere between *Stanton* and *Mill Pond I*, but for the following reasons closer to the latter, particularly in light of the purpose of the Right-of-Way, the actual impact of the offending objects in the Right-of-Way upon this purpose, and the

12

actions of the plaintiffs, including the long delay in requesting the relief they now seek—viz., the complete removal of the fence and trees.

The primary purpose of the Right-of-Way as initially established was to provide access to the lots located off of the main branch of Fire Lane 13—principally Lot B-1, Lot D and Lot E.[2] Though presumably drawn to a scale that would allow the Right-of-Way to be accepted by the City of Saco as a public way, that never occurred; and, as determined herein, title to the land underlying the Right-of-Way has acceded to the parties. Significantly, it was plaintiffs themselves who built the gravel road within the Right-of-Way's bounds to fulfill its purpose. The gravel road was built at their direction and to their specifications, and placed where they sited it. Plaintiffs have used the road for over 25 years without impediment, even after the fence, pine trees, and *arborvitae* trees were installed and are located, as the court has now determined, in the northeasterly portion of the Right-of-Way close to Lot B-1. In siting and installing these items, Welch relied on representations from Glenn King that the road was centered in the Right-of-Way; then measured the distance from the centerline of the road in order to place these items on what he believed to be his property and outside the boundaries of the Right-of-Way.

The fence, the two white pine trees, and the stone planter have not impaired or interfered at all with plaintiffs' use of the traveled portion of the Right-of-Way, nor impeded access to their property or any other use. Similarly, the *arborvitae* trees have not materially impaired or unreasonably interfered with plaintiffs' use of the traveled portion of the Right-of-Way to access their property. However, the evidence, though conflicted, does support the conclusion that some *arborvitae* tree limbs may present a

---

[2] Although Lot A and the McInnis Lot may be accessed from the Right-of-Way, these lots are also directly accessible from Fire Lane 13, the main road in from Route 112.

13

minor and temporary intrusion into or over the road at certain times during the winter after a heavy snowfall.

### 4. Injunctive Relief

The court has taken into consideration the four factors applicable to granting injunctive relief, including likelihood of success on the merits, the nature of the harm presented, a balancing of the respective harms to both parties, and the impact, if any, on the public interest. *See Windham Land Trust v. Jeffords*, 2009 ME 29, ¶ 41, 967 A.2d 690; *Ingaham v. University of Maine*, 441 A.2d 691 (Me. 1982). In light of this standard, the facts found above, and the foregoing legal conclusions reached, the court concludes that plaintiffs are not entitled to permanent injunctive relief requiring defendant to remove the items in question. However, defendant will be enjoined from permitting *arborvitae* tree limbs from intruding into or over the travelled portion of the Right-of-Way at any time; and he will be ordered to bind or trim the trees on at least an annual basis no later than September 30th of each year going forward in order to prevent this from occurring. This requirement is binding upon defendant as well as any successor in interest to the property.

### B. Count II of the Complaint: Trespass

Count II of the complaint asserts that defendant's paving of a portion of the Right-of-Way without plaintiffs' permission constituted a trespass in violation of 14 M.R.S. § 7551-B. Plaintiffs seek double damages, attorneys fees, and injunctive relief with respect to this claim.

Section 7551-B provides:

A person who intentionally enters the land of another person without permission and *causes damage to property* is liable to the owner in a civil action if the person: (A) Damages or throws down any fence, bar or gate; leaves a gate open; breaks glass; *damages any road*, drainage ditch, culvert, bridge, sign or paint marking; or does other damage to any structure on property not that person's own; or (B) Throws, drops,

14

deposits, discards, dumps or otherwise disposes of litter, as defined in Title 17, section 2263, subsection 2, in any manner or amount, on property not that person's own.

14 M.R.S. § 7551-B (emphasis added).

Plaintiffs have failed to prove trespass under this statute. They have not established how they were damaged. Even assuming that defendant authorized paving a portion of the Right-of-Way without their permission, plaintiffs have not put forward evidence that this damaged the road or other property they own. The claim in Count II is denied.

## C. Defendant's Counterclaims: Counts II, III, IV, and V.

Defendant's counterclaims for adverse possession (Count II), prescriptive easement (Count III), acquiescence (Count IV), and trespass (Count V) are denied. The adverse possession and prescriptive easement claims fail because he has not proven all required elements, including the baseline 20-year requirement. *See Dupuis v. Ellingwood,* 2017 ME 132, ¶ 14, 166 A.3d 112; *Androkites v. White,* 2010 ME 133, ¶ 13, 10 A.3d 677. The acquiescence claim is mooted by the court's conclusions that he owns the land underlying the easement and because this claim does not extinguish plaintiffs' deeded rights in and to the easement. Finally, in light of the court's conclusion regarding the easement boundaries, defendant's trespass claim fails as well.

### III. Judgment and Order

In accordance with the foregoing, it is hereby adjudged and ordered as follows:

1. As to Count I of plaintiffs' complaint:

a. The court declares the boundaries of plaintiffs' lots (Lot E and Lot D) and the Right-of-Way as those depicted on the Dow & Coulombe Plan.

b. Defendant James H. Welch and any successor in interest to the property:

15

(i) Shall employ all reasonable measures necessary to assure that no part of the *arborvitae* trees situated on the property and along the travelled portion of the Right-of-Way extend into or over the traveled portion the Right-of-Way consisting of the 16-foot road; and

(ii) Shall take said measures or assure they are in place by September 30th of each year.

c. Any further relief sought by Count I of the complaint is denied.

3. As to Count II of plaintiffs' complaint: Judgment for defendant James H. Welch.

4. As to Count I of defendant's counterclaim:

a. The court declares the boundaries of defendant's lot (Lot B-1) to be as depicted by the dotted lines on Defendant's Exhibit 2 (the R. W. Eaton Associates Plan), identified thereon as an overlay of the LaCroix Plan and Dow & Coulombe Plan, and being bounded on its northeast side by the southwest boundary of the first lot described in the McInnis deed and by Blunt Road; on its southeast side by the Right-of-Way as depicted in the Dow & Coulombe Plan; on its southwest side by the Right-of-Way as depicted in the Dow & Coulombe Plan extended along that same course to its intersection with Blunt Road; and on its northwest side by Blunt Road.

b. Any further relief sought by Count I of counterclaim is denied.

5. As to Counts II, III, IV, and V of defendant's counterclaim: Judgment for plaintiffs Glenn F. King and Julie A. King.

16

6. The court further declares:

    a. Plaintiffs Glenn F. King and Julie A. King hold fee title to the land underlying the Right-of-Way from its centerline to its boundary with Lot D and Lot E; and

    b. Defendant James H. Welch holds fee title to the land underlying the Right-of-Way from its centerline to its boundary with Lot B-1.

7. Each party is enjoined from using the Right-of-Way in a manner that unreasonably interferes with or damages any property, structure, lawn, or vegetation of the other located within or without the Right-of-Way.

8. Each party shall bear their own attorney's fees and costs.

The clerk may enter this Final Judgment and Order on the docket by reference pursuant to M.R. Civ. P. 79(a).

SO ORDERED

Dated: February 18, 2020

_____
Wayne R. Douglas
Justice, Superior Court

ENTERED ON THE DOCKET ON: 2/18/2020

17